Louis HAMILTON et al.

v.

Victor SCHIRO et al.

Civ. A. No. 69-2443.

United States District Court,
E. D. Louisiana,
New Orleans Division.

June 25, 1970.

Luke J. Fontana and Robert Hobbs, New Orleans, La., for plaintiffs.

Blake Arata, New Orleans City Atty., for defendants.

CHRISTENBERRY, District Judge.

This cause came on for hearing on plaintiffs' motion for preliminary and permanent injunction and the court, having considered the evidence, the stipulations of the parties and counsels' briefs, now makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. Orleans Parish Prison was built in 1929 and designed to house from 400 to 450 inmates.

2. The prison usually houses from 800 to 900 inmates even though the facility has never been enlarged.

3. The prison is a five-story structure with six cell-type areas and seven dormitory areas.

4. The cells, which are 13′x8½′x7½′ and constructed mainly of metal, were designed to accommodate four inmates, but six to eight inmates are usually confined in each cell.

5. Each cell is usually provided with a toilet and hand bowl, but some only have water from the toilet because of the inoperable condition of the hand bowl.

6. These toilet and hand bowls are so badly corroded and rusted that cleanliness is impossible.

7. The cells have no interior lighting, the only light entering them is that from the aisles outside the cells that slants in, thus leaving the cells dim and dingy at all times. There is even less light in the many areas where windows have been boarded up, or papers stuffed in them to keep out the elements.

8. The seven dormitory areas were designed to accommodate 40 men each but now house from 60 to 80 inmates each.

9. The inmates of Parish Prison are issued mattresses, which are rarely if ever sunned or cleaned, even though they may have been vomited or urinated upon. Because of the crowded condition many have to sleep on their mattresses on the cell floor or on the aisle floor.

10. The men are issued mattress covers which they use for long periods of time, and there is difficulty in having them cleaned because of the frequent breakdowns of the laundry equipment. No sheets or pillow cases are issued. Blankets are usually but not always provided.

11. Ventilation throughout the entire structure is very poor. It is worsened by the boarding up of windows to prevent inmates from simply pulling the bars out of the decayed windows and rotting plaster walls. As a consequence the inmates are subjected to extreme temperatures in summer and winter, with the temperature reaching over 100° during the summer months. Pipe decay and boiler malfunctions cause heating to be quite inconsistent and uneven. During the winter, the inmates are subjected to very cold dampness, as a result of the roof and side walls leaking.

12. The entire structure is infested with rats, mice, roaches and vermin as a result of the location of the prison over an extensive sewer system, and holes in the shower areas and floors caused by decay of the metal. Also, since the prison has no central dining area for inmates, the men eat in their tiers, causing food to be there to attract the rats and roaches, etc.

13. Because of faulty and inadequate plumbing most of the building and particularly the kitchen is permeated by a foul odor.

14. In the kitchen, plaster has fallen and continues to fall, and tile is missing, causing the kitchen to be unsanitary.

15. Bathing facilities are entirely inadequate, often 45 to 60 men have to use one shower, with low water pressure and no hot water, after many have spent a full day in physical activities for prison upkeep.

16. The inmates receive outdoor exercise only once every 20 to 30 days for two to three hours, depending on weather conditions.

17. All of the inmates are in constant danger of losing their lives should a fire occur in the prison. The Fire Prevention Division of the New Orleans Fire Department, after inspection, lists 29 violations, some of which are blatant. There is no fire alarm system; fire extinguishers are insufficient in number and many are empty and inoperable. Each tier has only one means of egress, and all fire escapes are inoperable and permanently sealed to prevent escape.

18. The danger of a fire occurring is increased by the inmates sometimes burning tightly rolled newspapers in their cells to keep warm in the winter and the fact that many windows are stuffed with newspaper.

19. The danger of an outbreak of contagious diseases is great as a result of the unsanitary conditions in the toilets, the kitchen, and the sleeping equipment. Further, no medical intake survey is made to detect prisoners with contagious diseases. Although the incidence of gonorrhea is high, only sporadic blood tests for syphilis are done. As a result of the crowded conditions, there is no isolation or quarantine area for those with contagious diseases that are detected.

20. Inmates are put in constant fear of and subjected to bodily injury and sexual attacks from other inmates. There are no isolation areas for any of the following dangerous groups, since there are only six single cells in the prison:

a) homosexuals and sexual offenders,

b) men who pose severe disciplinary problems,

c) mental defectives,

d) men with psychotic reactions or who are disturbed emotionally,

e) juveniles,

f) drug addicts, and

g) informers and those threatened by other prisoners.

As a result they are sometimes put in cells with first offenders and others.

21. The deteriorating ironwork and crumbling condition of the prison provide easy access to material from which inmates may fashion deadly weapons.

22. Supervision is woefully inadequate to provide any protection or deterrent effects to physical attacks once the tier door is closed and the guard is on one side and the prisoners on the other. Particularly in dormitory areas with 50 to 60 men, observation is very poor.

23. Since first offenders are not segregated, they frequently receive violent indoctrination into the norms and behavior of chronic offenders.

24. The combined effects of the fearful atmosphere and crowded and sordid living conditions has a severe effect on psychotics, often causing those transferred to the prison from mental hospitals to be returned to the hospitals. Disruptive psychotic prisoners are sometimes moved into a hallway by the main gate and shackled to the bars.

25. Hospital facilities and medical attention are woefully inadequate to meet the needs of the inmates. Inmates who should be confined to bed with chronic diseases must be kept on the open tiers. Medication that is prescribed frequently never reaches the inmate or else is taken from him by other prisoners.

26. The allotment by the City of $1.25 per diem per prisoner for food, bedding, uniforms, medication, janitorial supplies, maintaining the kitchen and laundry equipment and other needs is not adequate to provide the minimum human needs of the inmates.

27. The Central Police Lockup's existing facilities have never been more than partially filled, except on occasional weekends and this only in the male section. The 10th floor reserved for women has never been filled. Thus, the women in the prison (4 to 10 average) could be housed in unused new, existing facilities in a presently constructed, equipped, and staffed area.

28. The two unfinished floors of the same building have a normal capacity of 240 inmates in 24 ten-man cells. These floors could be finished and the cells used, thereby materially reducing the prisoner population of the Parish Prison.

29. The existing Parish Prison is owned by the City, maintained by city funds, and prisoners' subsistence is paid for by the City. Thus, in moving the prisoners to the new facilities there would be no involvement with any other political subdivision of government.

30. The Criminal Sheriff of the Parish of Orleans is doing the best he can with the facilities and means available to him.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and subject matter herein. 42 U.S.C. § 1983.

■ 2. Plaintiffs did not need to exhaust state remedies as a condition precedent to this court's asserting jurisdiction over their cause of action grounded on 42 U.S.C. § 1983. Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); Wright v. McMann, 387 F.2d 519 (2d Cir. 1967).

■ 3. Defendants are subject to the restraints of the Eighth and Fourteenth Amendments of the United States Constitution which prohibit the infliction of cruel and unusual punishment. Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

■■ 4. Plaintiffs as state prisoners may enforce their right to be free from cruel and unusual punishment and this court will intervene in matters of prison administration to protect their constitutional rights. Jackson v. Bishop, 404 F.2d 571 (8th Cir. 1968); Beard• v. Lee, 396 F.2d 749 (5th Cir. 1968); Wright v. McMann,• *supra*; Howard v. Smyth, 365 F.2d 428 (4th Cir.), cert. den., 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed. 2d 449 (1966); Morris v. Travisono, 310 F.Supp. 857 (D.R.I.1970); Holt v. Sarver, 309 F.Supp. 362 (E.D.Ark. 1970); Hancock v. Avery,• 301 F.Supp. 786 (M.D.Tenn.1969); Holt v. Sarver, 300 F.Supp. 825 (E.D.Ark.1969); Jordan v. Fitzharris, 257 F.Supp. 674• (N. D.Cal.1966).

■ 5. Prison life inevitably involves some deprivation of rights, but the conditions of plaintiffs' confinement in Orleans Parish Prison so shock the conscience as a matter of elemental decency and are so much more cruel than is necessary to achieve a legitimate penal aim that such confinement constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Beard v. Lee, *supra*; Wright v. McMann, *supra*; Howard v. Smyth, *supra*; Morris v. Travisono, *supra*; Holt v. Sarver, *supra*, 309 F.Supp. 362; Hancock v. Avery, *supra*; Kish v. County of Milwaukee, 48 F.R.D. 102 (E.D. Wis.1969); Holt v. Sarver, *supra*, 300 F.Supp. 825; Jordan v. Fitzharris, *supra*.

The court finds that the plaintiffs are entitled to relief and will enter an appropriate order.