520 F.2d 392
 DETAINEES OF the BROOKLYN HOUSE OF DETENTION FOR MEN et al.,
Plaintiffs-Appellees,
v.
Benjamin J. MALCOLM, Commissioner of Correction of the City
of New York, et al., Defendants-Appellants.
Ralph VALVANO et al., Plaintiffs-Appellees,
v.
Benjamin J. MALCOLM, Commissioner of Correction of the City
of New York, et al., Defendants-Appellants,
Nicholas Ferraro, District Attorney, Queens County, Defendant.
 Nos. 701, 702, Dockets 74-2427, 74-2482.
 United States Court of Appeals,
Second Circuit.
 Argued Feb. 28, 1975.
Decided July 31, 1975.
 
 1
 Mark D. Lefkowitz, New York City (W. Bernard Richland, Corp. Counsel, L. Kevin Sheridan and Donald J. Tobias, New York City, of counsel), for defendants-appellants.
 
 
 2
 Steven A. Herman, New York City (William E. Hellerstein, Joel Berger and Michael B. Mushlin, The Legal Aid Society Prisoners' Rights Project, New York City, on the brief), for plaintiffs-appellees.
 
 
 3
 Before LUMBARD and OAKES, Circuit Judges, and BARTELS, District Judge.*
 
 BARTELS, District Judge:
 
 4
 Just recently this Court held in Rhem v. Malcolm, 507 F.2d 333 (2d Cir. 1974), that the conditions existing at the Manhattan House of Detention (better known as "the Tombs") were so shocking and intolerable as to violate the constitutional rights of equal protection and due process of pretrial detainees ("detainees"). Today we are asked to reach a similar conclusion in a different context relating to the conditions of confinement of detainees at the Brooklyn and Queens Houses of Detention ("BHD" and "QHD," respectively). In November, 1970, Ralph Valvano on behalf of a class of all persons incarcerated at the QHD instituted a civil rights action under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 in the District Court for the Eastern District of New York against the Commissioner of Correction of the City of New York and other City officials, alleging as unconstitutional the inhumane and unsanitary living conditions and administrative practices at the QHD, and in February, 1973, Ray Moctezuma and others instituted on behalf of the detainees of the BHD a similar civil rights action against the defendants, alleging as unconstitutional similar living conditions relating to the custody of detainees at the BHD. Both complaints are patterned after the Rhem complaint and in effect protest essentially the conditions existing in the Tombs, such as restrictive visiting hours, denial of contact visits, inadequate recreation, restrictive correspondence rules, inadequate care, inhuman and unsanitary living conditions and brutality by guards.
 
 
 5
 On September 7, 1973, the District Court consolidated the two actions but tried only two issues which were common to both the BHD and QHD: (1) the alleged unconstitutional overcrowding and, more specifically, the confinement of two detainees in a single cell (double celling), and (2) the alleged unconstitutional excessive confinement of detainees in their 5' x 8' cells each day.
 
 
 6
 Immediately before the trial, the Court personally toured both Houses of Detention. After a six-day trial during which it considered the stipulation of facts, the Manual of Correctional Standards, the testimony of detainees, psychiatrists, prison wardens and other experts in the field, the Court made comprehensive findings on July 31, 1974, of the conditions existing at these two institutions. In its substituted order dated October 2, 1974, the district court decreed with respect to both institutions "that beginning March 1, 1975 no person shall be confined in a cell with another person without the voluntary written consent of both persons . . . ," except in certified emergencies, and at the same time it denied relief on the issue of excessive confinement on the ground that the two issues were interrelated and that the additional lockout time would result upon the elimination of double celling. On October 2, 1974, the Court entered its judgment prohibiting double celling from March 1, 1975, as impermissively restrictive and dehumanizing in violation of the plaintiffs' constitutional rights in accordance with its opinion above. From this judgment and order the City has appealed and has obtained a stay which is presently in effect. Thus, we are concerned only with the issue of overcrowding.
 
 
 7
 The City does not attack the Court's findings as clearly erroneous but instead claims that double celling is not per se unconstitutional and that under the totality of circumstances existing at these two institutions, double celling is a prison hardship that can be constitutionally justified. To this contention it adds another claim that the Court must in determining the constitutional minimum standards for detainees, look "inter alia, to the needs and resources of the governmental entity operating the jail." Upon this appeal we are not faced with the precise operating conditions that existed in the Tombs in Rhem,[1] which were condemned as "shocking to the conscience," nor with any claim of structural defects as existed in that case, nor was double celling an issue there since it was eliminated by a consent decree predicated upon a stipulation relating to overcrowding. To properly comprehend the housing and living conditions to which these detainees are subjected while awaiting trial, a brief resume of the conditions as reflected by the Court's findings is necessary.
 
 Facilities
 
 8
 The inmates, including detainees, are housed in two units constructed relatively recently as maximum security multi-story institutions. The floors in both institutions are divided into four quadrants with two tiers of fifteen cells, one above the other in each quadrant. All cells are rectangular 5 x 8 feet, approximately 40 square feet in floor space, containing two bunk beds, one table, one immovable seat, one unenclosed toilet and one mirror, and open onto corridors 90 feet long and 5 feet wide. There are no closets for clothing or personal effects of any of the inmates including detainees, and there is only one shower for each tier.
 
 
 9
 The rated capacity of BHD was 814 and of QHD 520, and in both instances is based on single occupancy of the 5 x 8 feet cells. The rate of occupancy for 1969-1973 was 170% of capacity at BHD and 153% of capacity at QHD. At the time of the hearings the rate of occupancy was 23% above capacity at BHD (998 persons) and 29% above capacity at QHD (670 persons). The actual overcrowding was greater because 90 cells, which are included in the rated capacity, at BHD were usually unoccupied and one dormitory and 40 cells were not in service at QHD. This resulted in the abnormal practice at both institutions of housing two men in a cell. Further overcrowding resulted in the elevators and dayrooms in which there was an inadequate number of chairs, and also in the lack of adequate gymnasium facilities; moreover, these gymnasium facilities were available generally only once or twice a week for each detainee. Time out of cells was divided into three periods at each institution and at BHD the lockout time was approximately 81/2 hours and at QHD the lockout time was approximately 93/4 hours per day. At both institutions the detainees were fed in their cells since the dayrooms at BHD and QHD could not accommodate all of the detainees of a double cell section at one time.
 
 
 10
 Only 20% of the detainees required maximum security at both institutions but due to an inadequate staff and budget, the classification system at both institutions has been and is inadequate. However, this issue, as well as other issues raised in both complaints, was not litigated in the district court. The more positive aspects of the two institutions include the fact that each institution has a gymnasium, a theater auditorium and an enclosed roof recreation area, the largest of which is approximately 3400 square feet, and also classroom areas and libraries. Other advantages are that the institutions are close to the detainees' homes, there is a policy of non-censorship of mail, a liberal access to the press, many minority correction officers and a large variety of activities and programs which, however, must be suspended on weekends because of overcrowding.[2]
 
 Overcrowding and Double Celling
 
 11
 Judge Judd found that confining two detainees in a space of 40 square feet created personal problems, which he ultimately concluded were dehumanizing. He stated that "Two men cannot move about at the same time in the portion of the cell which is not utilized for bunks, table, seat, and toilet. Since the meals are fed to inmates in the cells and there is only one chair, only one man can use the table and the other must sit on the bed to eat; the choice of who eats on the bed is made in varying ways, depending on seniority, rotation, strength, or other factors. Disagreements concerning the choice of activities, embarrassment and discomfort in the use of the toilet in the presence of a cell-mate, and disagreements concerning personal belongings are common. Fights and charges of theft are frequent, although fights between inmates who do not share cells are also common. Loss of privacy is one of the major results of double celling."
 
 
 12
 Many detainees testified as to specific dehumanizing incidents arising from double celling, such as bumping into each other, the necessity of one detainee eating his meals sitting either on the bed or toilet,[3] the use of the toilet by one while the other is eating close by, and many other invasions of privacy. Correctional experts testified that confinement of two detainees together not only deprives a detainee of privacy but also is psychologically destructive and increases homosexual impulses, tensions and aggressive tendencies.[4] In 1965 the United Nations' Congress on the Prevention of Crime and the Treatment of Offenders adopted a set of Standard Minimum Rules for the Treatment of Prisoners, which recommended that each inmate have an individual cell. The Manual of Correctional Standards issued in 1966 by the American Correctional Association recommended (p. 49) that "All cells should be designed for the use of one prisoner. The minimum clear size of an interior cell should be approximately 50 square feet, with an elevation of not less than 8 feet."[5]
 
 
 13
 The sad and shameful history of penology in this country has been decried and condemned by many authorities and it is hardly necessary at this late date to belabor the issue. Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); Brenneman v. Madigan, 343 F.Supp. 128 (N.D.Cal.1972); Inmates of Milwaukee County Jail v. Petersen, 353 F.Supp. 1157 (E.D.Wis.1973); Hamilton v. Love,328 F.Supp. 1182 (E.D.Ark.1971). The conditions in our prisons are inextricably related to our system of criminal justice and what might otherwise be lawful detention becomes an unconstitutional restriction when those conditions become so dehumanizing as to constitute an additional hardship beyond the need for custody in violation of the detainees' due process and equal protection rights. The failure in the past of legislators to take the proper correctional action to remedy these inhuman conditions for both detainees and convicted prisoners has eroded the historical reluctance of federal courts to interfere with the administration of penal institutions. Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); Cruz v. Beto, 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972); Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Indeed this failure has required the courts to take action in the interests of fundamental decency and the protection of the constitutional rights of the inmates. One of the factors that bears upon the present condition of crowding in the City's correctional institutions is the backlog of criminal cases pending in the State criminal courts, causing delays of weeks and months before a defendant, unable to make bail is brought to trial either because he lacks the fee or he is charged with a non-bondable offense. Despite some recent improvements by the State courts in reducing the waiting time for the trial of detainees, neither the State nor the City has taken the necessary action to prevent or reduce overcrowding. See Wallace v. Kern, 520 F.2d 400, 401 n.3 (2d Cir. 1975); Wallace v. Kern, 499 F.2d 1345 (2d Cir. 1974).
 
 
 14
 Here we are concerned only with the confinement of pretrial detainees and not convicted inmates. The difference between these two categories and the necessity for different treatment have been frequently emphasized. Pretrial detainees are no more than defendants waiting for trial, entitled to the presumption of innocence, a speedy trial and all the rights of bailees and other ordinary citizens except those necessary to assure their presence at trial and the security of the prison. In providing for their detention, correctional institutions must be more than mere depositories for human baggage and any deprivation or restriction of the detainees' rights beyond those which are necessary for confinement alone, must be justified by a compelling necessity. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Tate v. Short, 401 U.S. 395, 91 S.Ct. 668, 28 L.Ed.2d 130 (1971); Williams v. Illinois, 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970); Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Collins v. Schoonfield, 344 F.Supp. 257 (D.Md.1972); Seale v. Manson, 326 F.Supp. 1375 (D.Conn.1971); Davis v. Lindsay, 321 F.Supp. 1134, 1139 (S.D.N.Y.1970); see Note, Constitutional Limitations on the Conditions of Pretrial Detainees, 79 Yale L.J. 941 (1970).[6]
 
 
 15
 The central issue here is the effect upon the constitutional rights of detainees of overcrowding, necessitating double celling and other human compression in the rest areas, such as lockout corridors and dayrooms. We recognized in Rhem that although the cruel and unusual punishment clause of the Eighth Amendment may not be applicable to the treatment of unconvicted detainees, such cruel and inhuman treatment may in itself constitute a violation of due process and equal protection. We need not reach the questions whether double celling per se is unconstitutional or whether it is possible to construct cells of sufficient size and with sufficient accommodations to permit double celling without deprivation of a detainee's rights. What we are faced with here is whether double celling in a cell 5 x 8 feet, 40 square feet of floor space, creates such dehumanizing conditions as to deprive the detainees of their constitutional rights of due process and equal protection. When a detainee is crammed into a 5 x 8 foot cell designed for single occupancy with another detainee for fourteen to sixteen hours per day for an average of sixteen weeks, he is forced to suffer numerous indignities, invasion of privacy and risk of harm to his person and property.
 
 
 16
 As we have noted, double celling has been disapproved by various correctional associations and numerous experts on prison reform. It has been specifically condemned by lower courts in Inmates of Suffolk County Jail v. Eisenstadt, supra (cell 8 x 11 feet); Tyler v. Percich, Civil Action No. 74-40C (2), (E.D.Mo., Filed Oct. 15, 1974) (cell 8 x 5 feet), and also by State courts in Wayne County Jail Inmates v. Wayne County Board of Commissioners, Civ.Action No. 173217 (Cir.Ct. Wayne Co., Mich. July 28, 1972 and May 25, 1971), aff'd and remanded, 391 Mich. 359, 216 N.W.2d 910 (1974) (cell 6 x 7 feet); Commonwealth ex rel. Bryant v. Hendrick, 444 Pa. 83, 280 A.2d 110 (1971). Overcrowding alone in pretrial detention facilities above rated capacities has also been held to create a restrictive and deplorable living environment constituting an intolerable violation of the detainees' constitutional rights. Taylor v. Sterrett, 344 F.Supp. 411 (N.D.Tex.1972), aff'd in part, rev'd in part, 499 F.2d 367 (5th Cir. 1974); Hamilton v. Love, supra; Jones v. Wittenberg, 323 F.Supp. 93 and 330 F.Supp. 707, 714 (N.D.Ohio 1971), aff'd sub nom, Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972); Hamilton v. Schiro, 338 F.Supp. 1016 (E.D.La.1970).
 
 
 17
 The City concedes that the hardships associated with double celling of detainees are not necessary for the purpose of confinement only, but it contends that there has been no showing of any violations of constitutional rights of the detainees at both BHD and QHD, citing Johnson v. Lark, 365 F.Supp. 289 (E.D.Mo.1973), and Jones v. Wittenberg, supra. Those cases were addressed to the reduction of jail population in excess of stated capacities and single cell occupancy was not litigated. At all events, insofar as they impliedly sanction double celling in single occupancy cells, their rationale must be rejected at least in the circumstances in the BHD and QHD. The City attempts to justify the conditions existing at these two institutions upon the ground that double celling in conjunction with the totality of other circumstances at these jails did not impose any substantial or additional hardships on detainees above those necessarily caused by confinement in any large metropolitan jail. Assuming this statement to be accurate, the conditions existing in other large metropolitan jails can hardly be used as a criterion to justify double cell conditions of pretrial detainees in BHD and QHD. We agree with the district court's finding that under the conditions here present double celling of pretrial detainees is constitutionally impermissible.
 
 
 18
 Finally, the City maintains that on balance the conditions here complained of are not so constitutionally offensive as to compel the City, given its limited jail facilities and financial resources, to build additional facilities to house the prisoners in Brooklyn and Queens and elsewhere. Inadequate resources of finances can never be an excuse for depriving detainees of their constitutional rights. Rhem v. Malcolm, supra, at 341, n. 20; Gates v. Collier, 501 F.2d 1291, 1320 (5th Cir. 1974); Jackson v. Bishop,404 F.2d 571, 580 (8th Cir. 1968); Hamilton v. Love, supra; Jones v. Wittenberg, supra. On the other hand, as the above authorities indicate, this Court is hardly in the position to order the City to raise the necessary funds to build additional facilities. We can, however, order the release of persons held under conditions which deprive them of rights guaranteed by the Constitution unless the conditions are corrected within a reasonable time.
 
 
 19
 For a solution of the problem, we conclude that this proceeding should be remanded to the district court to consider a proper remedy equitable to both the City and the detainees, keeping in mind the financial crisis facing the City and the practical considerations necessary to prevent the detainees from being transferred to distant facilities. Both parties should have an opportunity to make suggestions with the understanding that the City must act with reasonable promptness to provide facilities for pretrial detainees consistent with their constitutional rights. Inaction of course will not be tolerated nor will the present conditions be condoned.
 
 
 20
 We affirm upon the findings of facts and conclusions of law of the district court that the overcrowding and double celling of detainees at the two institutions create an unconstitutional deprivation of their due process and equal protection rights. Since the district court's order of October 2, 1974 is not limited to detainees, its restriction is too broad and the court is accordingly directed to modify its order to limit the restriction to detainees only. Accordingly, we remand the case to the district court for the purpose of fashioning a remedy in the light of this opinion.
 
 
 
 *
 Of the Eastern District of New York, sitting by designation
 
 
 [1]
 371 F.Supp. 594, 599 (S.D.N.Y.1974)
 
 
 [2]
 High School equivalency programs are available and weekly movies are shown in the auditorium and periodic live plays and concerts are presented by outside groups
 
 
 [3]
 The discomfort of eating in a cell is not, of itself, an unconstitutional hardship within Sostre v. McGinnis, 442 F.2d 178 (2d Cir. 1971), cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972)
 
 
 [4]
 Testimony of Donald H. Goff, Director of the United States Commission on Civil Rights, Prisoners' Rights Project; Dr. Augustus Kinzel, a practicing psychiatrist and instructor of psychiatry at Columbia University, New York; Louis P. Gengler, Warden of the Federal Detention Center, New York City; Arthur Rubin, then Warden of QHD; and Robert B. McKay, Dean of New York University Law School, former Chairman of the New York City Board of Corrections, and former Chairman of the New York Special Commission on Attica
 Mr. Goff testified that:
 "One of the reasons why we have this emphasis upon one man to a cell and not having individuals in a very tight situation is to reduce problems of administrators.
 "You reduce your tensions, reduce the administrative problems, reduce the fights, sodomy, the anxieties simply by this technique (single celling). It is a way of reducing and calming down a population which is normally under pressure anyway (302a)."
 
 
 [5]
 This manual was drafted by a committee which included the Director of the United States Bureau of Prisons; the Chairman of the New York State Board of Parole, Russell G. Oswald; and the Commissioner of Corrections of the City of New York, Anna M. Kross
 See also the Standard Minimum Rules for the Treatment of Prisoners adopted by the Council of Europe's European Committee on Crime Problems (1955) and (1973) which recommends single celling.
 As far back as 1790 the Walnut Street Prison in Philadelphia provided for individual cell blocks comprised of cells eight feet by six feet and ten feet high. Gustave de Beaumont and Alexis de Tocqueville, On the Penitentiary System in the United States and its Application in France, 1833 (Carbondale, 1964), p. xxii, et seq. In New York State early in the 19th century the "Auburn System" was developed, the primary constituent of which was an individual seven by three and a half foot cell. Clarence C. Schrag, "Prison," Encyclopaedia Britannica, 1967, vol. 18, p. 557. Even the infamous Newgate of Dickens's England had individual eight by six foot cells, as he described in Sketches by Boz (New York, 1958 (originally published 1836-1837)), p. 200, et seq.
 
 
 [6]
 De Beaumont and de Tocqueville noted in On the Penitentiary System in the United States and its Application in France (1833) that:
 " . . . we have seen in the house of arrest in New York (Bridewell) more than fifty indicted persons in one room. These arrested persons are precisely those for whom well-regulated prisons ought to have been built. It is easy in fact to conceive, that he who has not yet been pronounced guilty, and he who has committed but a crime or misdemeanour comparatively slight ought to be surrounded by much greater protection than such as are more advanced in crime, and whose guilt has been acknowledged.
 "Arrested persons are sometimes innocent and always supposed to be so. How is it that we should suffer them to find in the prison a corruption which they did not bring with them?
 "If they are guilty, why place them first in a house of arrest, fitted to corrupt them still more, except to reform them afterwards in a penitentiary, to which they will be sent after their conviction?
 "There is evidently a deficiency in a prison system which offers anomalies of this kind." (At p. 49.)