Robert J. WEST, # 72812, Eugene E. Culpepper, # 81081, and William H. Cobb, # 85868, Plaintiffs,

v.

James EDWARDS, Governor of the State of South Carolina, William D. Leeke, Commissioner, South Carolina Department of Corrections, J. L. Harvey, Warden, Kirkland Correctional Institution, Defendants.

Civ. A. No. 77–670.

United States District Court,
D. South Carolina,
Columbia Division.

Nov. 1, 1977.

West, pro se.

Emmet H. Clair, Asst. Atty. Gen., Columbia, S. C., for defendants.

## ORDER

BLATT, District Judge.

Plaintiffs in this action filed under 42 U.S.C. § 1983 seek damages and equitable relief from certain state officials for an alleged violation of their Eighth Amendment rights. In substance, the complaint charges that the action of prison officials in "triple-celling" inmates at Kirkland Correctional Institution (KCI) amounts to cruel and unusual punishment.

The present action arises from the following factual background. KCI was constructed in 1975 with a "design capacity" of 448. Before construction was completed, it was determined that an adjustment would have to be made to allow the "operating capacity" of the facility to be increased to 848. Until February 23, 1977, there were two men in the majority of the cells, which cells contain 66 square feet of living space. In addition, each set of 64 cells—(called "dormitories")—has eight open "bay areas" which areas contain 2,850 square feet, four hallways containing 1,052 square feet, and eight showers. On February 23, 1977, due to overcrowding at other facilities, the Department of Corrections instituted "triple-celling" in two of the sections of KCI. As a result, each inmate in a triple-celled area has 22 square feet of living space within the cell. When added to the space available outside the cell in each dormitory, there is a total of approximately 42.3 square feet of living space per inmate. Access to this additional 20.3 feet of dormitory space is restricted from 10:00 p. m. until morning and for about 40 minutes at 6:00 p. m. when the official "count" is taken. Approximately five times since triple-celling was insti-

tuted, the cells were not unlocked after the 6:00 p. m. "count" because of difficulty in confirming a correct "count."

The first question to be decided by this court in determining the constitutional sufficiency of the space provided is the actual amount of living space that is available. The plaintiffs urge this court to consider only the 22 square feet per man provided inside the cells while the defendants view the proper figure as the 42.3 square feet encompassing the entire "dormitory" area. Determination of this issue rests on a practical assessment of the availability to the prisoners on a day-to-day basis of the additional 20.3 square feet of space outside of the cells. Plaintiffs contend that, since they were not allowed access to the outside dormitory areas (between 6:30 p. m. and 10:00 p. m.) on five occasions, this additional footage should not be considered as part of their living space. However, this court refuses to sit as a "superwarden" to castigate prison officials for failing to unlock cells when this action was taken for a legitimate penological purpose—(verifying the "count")—and was no more egregious than necessary to achieve that legitimate goal. These five instances do not, in this court's opinion, rise to a constitutional deprivation.

As noted above, prisoners are not generally restricted to their cells, nor, for that matter, to their dormitories until 6:00 p. m. The only time they are required to be in their cells is at 6:00 p. m. for the forty minute "count", and after 10:00 p. m. for the night. They shower, eat, and recreate outside their cells, and they have access to all prison facilities until 6:00 p. m., at which time they are restricted to their dormitories. Apparently, there is nothing in the "bay areas" and hallways but empty space so some prisoners choose to stay in their cells to watch television, even though they are free to mingle in these open areas from approximately 6:40 p. m. until 10:00 p. m. For these reasons, the court feels that it is proper to consider the inmates' "living

space"[1] as encompassing not only the 22 square feet per person in the cells proper, but also the additional 20.3 square feet allocable to each man from the "bay areas" and hallways.[2]

With the figure of 42.3 square feet per inmate in mind, this court must analyze the applicable constitutional standards. The basic Eighth Amendment prohibition against cruel and unusual punishment proscribes measures which are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). It is to this standard that the court must look to determine the constitutionality of conditions challenged in the instant case.[3]

A substantial controversy has arisen in recent years as to whether prison overcrowding alone can rise to a constitutional violation. The vast majority of cases decided concerning alleged overcrowding in prisons have involved a combination of factors which, in concert, have been held to be "cruel and unusual punishment." *See, e. g., Martinez Rodriguez v. Jiminez*, 409 F.Supp. 582 (D.P.R.1976) (overcrowding, understaffing, lack of beds, inadequate medical services, danger of physical abuse); *Mitchell v. Untreiner*, 421 F.Supp. 886 (N.D.Fla.1976) (same factors as above); *Campbell v. McGruder*, 416 F.Supp. 100 (D.D.C.1975) (same factors as above); *Landman v. Royster*, 333 F.Supp. 621 (E.D.Va.1971) (same

factors as above with the following additions: nude confinement, chaining within cells, tear gas use, denial of sanitary facilities). On the other hand, several cases cited as holding that overcrowding *per se* is a constitutional violation reveal, on closer reading, that they involve additional vices which are triggered by overcrowding. *See, e. g., Taylor v. Sterrett*, 344 F.Supp. 411 (N.D.Tex.1972), *aff'd. in part, rev'd. in part*, 499 F.2d 367 (5th Cir. 1974) (overcrowding, inadequate medical care, lack of exercise areas); *Hamilton v. Schiro*, 338 F.Supp. 1016 (E.D.La.1970) (overcrowding, lack of supervision, insufficient nutrition). Additionally, several lower court decisions which had declared absolute minimum constitutional living space have been modified by appellate courts. Of particular interest are *Newman v. Alabama*, 349 F.Supp. 278 (M.D. Ala.1972) and *Pugh v. Locke*, 406 F.Supp. 318 (M.D.Ala.1976); *modified, aff'd. in part, and remanded sub nom* (*Newman v. Alabama*, 559 F.2d 283 (5th Cir. 1977)), in which the Fifth Circuit Court of Appeals, while commending Chief Judge Frank Johnson's attempts to rectify deplorable prison conditions in Alabama, nevertheless directed him to reconsider his mandate requiring a minimum of 60 square feet of cell space in light of its recent decision in *Williams v. Edwards*, 547 F.2d 1206, 1215 (5th Cir. 1977). The following language from that opinion indicates a possible retrenchment by this appellate court from the absolutist position taken by the district court:

1. This court notes that one recent decision has seemingly disregarded non-cell living space and concentrated on "sleeping space" as a basis for constitutional analysis. *Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D.Ohio 1977). In *Chapman*, however, a substantial number of the prisoners involved spent all but four to six hours a week in their cells with their cellmates. Such is not the situation here.

2. A recent case defining "living space" comports with this court's view. In *Ambrose v. Malcolm*, 414 F.Supp. 485 (S.D.N.Y.1976), the court said: "Goff is well acquainted with professionally recognized standards of minimal 'living space' per inmate—that is space for sleeping and other private purposes—supplemented by day room or recreation space." (at 489). The *Ambrose* court went on to add the space available to inmates in their cells. (1,650

square feet) to the space available in their "day room" (480 square feet) to arrive at its figure for "living space" of 2,130 square feet.

3. For this reason, although the "living space" and/or "sleeping space" allocated at KCI may not be in conformance with recommended standards, such incompatibility does not conclusively establish a constitutional violation, although such evidence is entitled to be considered. To the extent that some cases may have indicated that compliance with these standards is a *sine qua non* of constitutionality, this court disagrees. *See, Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D.Ohio 1977). For a case according with this court's view of the weight to be accorded such evidence, see *Ahrens v. Thomas*, 434 F.Supp. 873, 885 (W.D.Mo.1977).

"At the outset, we hold that the steps taken by the District Court to ensure reasonably adequate food, clothing, shelter, sanitation, necessary medical attention, and personal safety for the prisoners were within its sound discretion and will not be disturbed on appeal. Some of the steps in regard to these matters, if considered in isolation, may have gone beyond constitutional mandates but they were justifiably invoked for the eradication of Eighth Amendment conditions. . . ." at 288.

"If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight." at 291.

That court further held that there is no constitutional requirement that prisons adhere to design standards, nor that prisoners be placed in single cells. Such position is apparently contrary to that currently taken by other courts such as *Valvano v. Malcolm*, 520 F.2d 392 (2d Cir. 1975), which is cited for the proposition that "rated capacity" is a constitutional touchstone (*Ambrose v. Malcolm*, 414 F.Supp. 485 (S.D.N.Y.1976)), although the opinion in *Valvano* does not expressly so hold. In the Fourth Circuit, while the Court of Appeals has never expressly so held, that Court has strongly suggested that it is the effect of overcrowding that must be analyzed in order to ascertain whether a given density of prisoners fosters collateral conditions tantamount to cruel and unusual punishment. In *Crowe v. Leeke*, 540 F.2d 740 (4th Cir. 1976), in speaking to a prisoner's contention that his confinement in a maximum security cell nine feet long and seven feet wide—(sixty-three square feet)—with two other inmates violated the Eighth Amendment, the court said:

"Crowe's complaint does not assert that while confined in Cell Block Number Two he was subjected to mental abuse or corporal punishment; was deprived of the basic implements of personal hygiene; was denied medical care or an opportunity to exercise; nor does he allege that his cell failed to meet certain reasonable sanitary standards. *See, Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974); *LaReau v. MacDougall*, 473 F.2d 974, 977 (2d Cir. 1972), *cert. denied*, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973). Rather the condition he complains of, while unpleasant, results from the 'usual incidents of confinement in maximum security.' *Breeden v. Jackson, supra* at 579.

From an examination of the record, the cramped cell conditions in Cell Block Number Two have not resulted from prison rules which can be characterized as 'vindictive, cruel or inhuman.' *Roberts v. Pegelow*, 313 F.2d 548, 550 (4th Cir. 1963). The placement of inmates who have sought protective custody classification and the number of inmates who may be safely assigned to a cell is a matter resting within the sound discretion of the prison administration. There is no indication that the overcrowding has resulted from an 'arbitrary or capricious' exercise of judgment by prison officials. *See, Breeden v. Jackson, supra*, at 581. Standing alone, Crowe's claim that, until transferred to a new facility now under construction, he is forced to sleep in an overcrowded cell is not a condition of confinement which shocks the conscience so as to fall within the constitutional prohibition against cruel and unusual punishment. *See, Sweet v. South Carolina Department of Corrections, supra; White v. Sullivan*, 368 F.Supp. 292, 296 (S.D.Ala.1973)." at 742.

■ Turning to an examination of the conditions at KCI to determine if the totality of conditions there is incompatible with the evolving standards of decency that mark the progress of a maturing society, this court finds that KCI was completed in July, 1975, at a cost of approximately 11.6 million dollars. The grounds within the fence comprise approximately forty acres. The evidence of record indicates clearly that the increase in inmate population, which is the subject of this case, has not significantly affected the delivery of serv-

ices to inmates. The plaintiffs do not complain about sanitation, food service, environmental—(temperature)—conditions, lack of proper clothing, or other similar hardships. Their sole complaint is overcrowding with an attendant increase in use of shower facilities. It is to be expected that an increase in inmates will increase the use of all prison facilities. While the conditions at KCI are not as pleasant as they ideally could be, such conditions do not, in the opinion of this court, without more, constitute a violation of the plaintiff's Eighth Amendment rights.[4] (See, "Prisoner's Rights Litigation," 11 *University of Richmond Law Review*, 803, 871 (1977)). Based on the foregoing, it is

ORDERED, that the complaint herein be, and the same hereby is, dismissed.

AND IT IS SO ORDERED.

---

**4.** After the preparation of this Order, but prior to the filing thereof, the Fourth Circuit Court of Appeals has confirmed the views expressed in this Order by its opinion in the case of *Hite v. Leeke*, 564 F.2d 670 (4th Cir. 1977).