**Wardell CAMPBELL**

v.

**Belvin F. BERGERON, Sheriff, West Baton Rouge Parish, John Doe and XYZ Insurance Company.**

Civ. A. No. 77–343–B.

United States District Court, M. D. Louisiana.

March 17, 1980.

Michael C. Palmintier, Baton Rouge, La., for plaintiff.

Emile C. Rolfs, III, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This action is brought under 42 U.S.C. § 1983 for damages because of personal injuries sustained by plaintiff during his pretrial detention in the West Baton Rouge Parish jail. Defendants are Belvin F. Bergeron, Sheriff of West Baton Rouge Parish, and former deputy, Paul C. Pattan. Under Louisiana law the Sheriff is responsible for the operation of the parish jail.

Plaintiff also attempted to assert pendent state law negligence claims under Article 2315 of the Louisiana Revised Civil Code (there is no diversity of citizenship between plaintiff and defendants), but the Court declined to permit the filing of an amended complaint asserting those claims. Thus, only the "constitutional tort" claims under 42 U.S.C. § 1983 are before the Court.

This matter was tried without a jury and was submitted to the Court upon post-trial briefs which have been filed by each side. For reasons given below, I find no liability on the part of the Sheriff, I find that the claim against Deputy Pattan has not prescribed and, on the merits, that Deputy Pattan is not liable to plaintiff.

I.

*Factual Background*

On the afternoon of Sunday, September 19, 1976, Wardell Campbell and his friend, Charles Welch, both of whom reside in Baton Rouge, drove across the Mississippi River bridge into West Baton Rouge Parish in Campbell's automobile. They went to visit friends in Addis, Louisiana, and there they stayed for a period of an hour or so. Thereafter, they went to a local night spot, "W. G. West's." While at the tavern, Campbell drank "quite a few" beers and "a pint or so" of Jack Daniels. The length of their sojourn in the barroom is not clearly established, but they were there certainly for five or six hours. In any event, at some time past midnight, Campbell and Welch left the lounge and started back toward Baton Rouge. Campbell, recognizing that he had consumed more beer and Jack Daniels than would be safe for the operation of a motor vehicle, requested that Welch drive. As they approached the old Mississippi River bridge, something in the operation of the vehicle attracted the attention of the Port Allen City Police Department, and two officers stopped the vehicle. The City Police determined that Welch, who had had little or nothing alcoholic to drink, was operating

the vehicle with a suspended driver's license. They also determined that Campbell's automobile was not equipped with the license plate issued for it by the State of Louisiana but instead displayed a different tag. The Port Allen officers brought both men to the West Baton Rouge Parish jail, issued Welch a ticket for driving without a valid operator's license,[1] and issued Campbell a ticket because of the switched license plates.

Both Welch and Campbell were, in Welch's term, "feeling salty" because of the arrest; neither felt that the arrest was justified, Welch because he thought that his license had been restored to him and Campbell because he thought that it was a simple accident in putting the wrong tag on the vehicle. In any event, the police officers apparently indicated to them that they would be permitted to leave if they signed the tickets.[2] They refused to do so. The Port Allen police officers then requested that the jailer, Deputy Sheriff J. C. Tullier, book them in the parish jail as persons in custody awaiting trial on City Police charges.

Tullier issued a "booking slip" regarding each of the men, gave each a bag in which to place his personal belongings and then placed them into a cell which also contained three other occupants. The time noted on the "booking slip" was 1:30 A.M., September 20, 1976.

The other occupants of the cell were: Ronald G. "Devil" Griffin, age twenty-three, who was serving a year and one month for burglary; George "Popeye" Cummings, Jr., age twenty-three, who was a pretrial detainee charged with (and later acquitted of) possession of stolen property; and James "Sport" Matthews, Jr., age thirty-two, who was serving time on a burglary conviction.

Deputy Tullier testified, and the Court accepts the testimony, that Tullier put Campbell in the cell and was about to put Welch in a different cell when someone, either Welch or Campbell or both of them, requested that Welch be placed in the same cell. The deputy then obtained a mattress from another cell and Welch stretched out on it on the floor. The four other occupants all had bunks.

At some time undetermined, after the men were placed into the cell, a fight broke out between Campbell and others, and Campbell suffered very serious injuries to his left eye. He is now completely blind in that eye and it will have to be surgically removed.

## II.

### Liability of Sheriff Bergeron

The evidence is undisputed that Campbell was arrested by Port Allen police officers with whom Sheriff Bergeron has no connection, that Sheriff Bergeron was not present in the jail on the night of the arrest, that he did not personally participate in the booking of plaintiff and did not find out about plaintiff's injuries until after his arrival at his office on Monday morning, some time after 8:00 A.M. In other words, Sheriff Bergeron had no personal participation in or involvement with plaintiff's arrest, detention or injury.

The law is now settled that in a Section 1983 action a Louisiana sheriff may not be held liable for the acts of his deputies under the doctrine of *respondeat superior* or any other theory of vicarious liability. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Baskin v. Parker*, 602 F.2d 1205 (5th Cir. 1979). Thus, since the Sheriff had no personal involvement with any phase of Campbell's arrest, incarceration or injury,

1. Welch testified that he was administered a "test" regarding his alcoholic consumption but that he passed the test and was not charged with operation of the vehicle while under the influence of alcoholic beverages. Campbell explained that he had repair work done to his

automobile and had inadvertently put the wrong license plate back on the car.

2. The Court concludes that this request must have been to sign the standard agreement to return for court appearance which is printed on most traffic tickets.

there can be no liability unless those injuries resulted from some official policy which the Sheriff had adopted or which, under the Constitution, the Sheriff was clearly and unequivocally required to adopt.

Plaintiff argues that the Sheriff is liable here upon the theory that the Constitution mandates that pretrial detainees be physically separated from those who have already been convicted of crime. Further, he argues that Sheriff Bergeron had not promulgated such a policy and that the lack of such a rule deprived him of his constitutional right as a pretrial detainee to separate facilities. Finally, plaintiff argues that the absence of a separate housing policy proximately caused his injuries when the other occupants jumped upon him and beat him.

No authority from the Constitution or from the jurisprudence has been cited to this Court to sustain the threshold proposition, that a pretrial detainee has a constitutional right to be confined in separate facilities from convicted persons. The Court, on its own, has not been able to discover any authority to sustain that proposition.

There can be no doubt that persons arrested and charged with offenses who do not make bail are entitled, under the Constitution, to humane and reasonably safe detention facilities. Since they have not yet been convicted of any crime and the only reason for their confinement is to secure their presence at trial, they must be held under the least restrictive means necessary to accomplish that result. Of course, they are not subject to punishment, retribution and deterrents which may be imposed upon those who have been convicted. *Taylor v. Sterrett*, 532 F.2d 462 (5th Cir. 1976); *Collins v. Schoonfield*, 344 F.Supp. 257 (D.C. Md.1972).

The courts have, rather frequently, addressed the rights of pretrial detainees but they usually involve such issues as jail conditions, including sanitation and overcrowding, *Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974); *Detainees of the Brooklyn House of Detention for Men v. Malcolm*, 520 F.2d 392 (2d Cir. 1975); *Campbell v. McGruder*, 416 F.Supp. 100 (D.C.D.C.1975), affirmed in part, remanded in part, 188 U.S.App.D.C. 258, 580 F.2d 521 (D.C.Cir.1978); *Hamilton v. Love*, 328 F.Supp. 1182 (E.D.Ark.1971); *Brenneman v. Madigan*, 343 F.Supp. 128 (N.D.Cal.1972); or use of punishment, *Anderson v. Nosser*, 438 F.2d 183 (5th Cir. 1971); *Pugh v. Rainwater*, 557 F.2d 1189 (5th Cir. 1977), rehearing 572 F.2d 1053 (5th Cir. 1978); *Collins v. Schoonfield, supra*; or excessive restrictions on freedom of movement, including length of time in cell and the use of maximum security installations, *Rhem v. Malcolm, supra; Duran v. Elrod*, 542 F.2d 998 (7th Cir. 1976); or the censorship of prison mail and the unnecessary limitation of visitation privileges, exercise and recreation, *Taylor v. Sterrett, supra; Duran v. Elrod, supra; Rhem v. Malcolm, supra; Collins v. Schoonfield, supra*. No case that we have been able to find mandated the segregation of pretrial detainees from the rest of the institution population.

The Sheriff had no policy requiring separate facilities for pretrial detainees. There was a policy requiring isolation of prisoners with reputations for violence, without regard to pretrial or post-trial status.

Plaintiff does not complain about the physical conditions of the cell, nor has he alleged or offered evidence that his confinement restricted him beyond that necessary to insure his appearance for trial. The fact that five men were put in a four-man cell is unimportant, because there is nothing in the record to show that such a situation so overcrowded the cell as to cause genuine privations or hardships. *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). On the contrary, the evidence convinces the Court, as noted above, that Campbell and Welch requested that they be placed in the same cell.

Our reading of the jurisprudence discloses that in several of the decisions the Court has noted that pretrial detainees were being housed with the rest of the prison population but none condemned the practice, *per se*. See *Campbell v. McGruder*, 188 U.S. App.D.C. 258, 580 F.2d 521 (D.C.Cir.1978). In *Brenneman v. Madigan, supra*, the Court found it impermissible to classify pretrial

detainees with those prisoners also convicted for purposes of determining conditions of confinement. The focus of this rule, however, is upon the punishment and restrictions which can be applied to persons convicted, as noted above.

■ In *Bell v. Wolfish, supra,* the Supreme Court discussed the issue of due process violations in the context of prison conditions, restrictions and pretrial detainees. That prison held both pretrial detainees and convicted inmates and the Court remarked:

> "There is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates. Indeed, it may be that in certain circumstances they present a greater risk to jail security and order." (99 S.Ct. at 1878, Footnote 28)

Plaintiff's theory suggests that any person who is convicted of a crime automatically poses a threat of physical harm to all other persons, thereby requiring his isolation from people who have not been convicted of crime. I cannot accept that proposition, either as one of law or of human nature. Consequently, I conclude that in the absence of some specific factual information indicating that a particular prisoner poses a threat of harm to other inmates, there is no duty to isolate him. In that connection, I see no difference between convicted inmates and pretrial detainees; if a prisoner in either classification poses a serious threat of physical injury to his fellow inmates and that fact is known or reasonably should be known by the persons in charge of the facility, a duty would arise to take reasonable steps to protect the other inmates. The evidence in this case, however, does not suggest that Matthews, Griffin or Cummings (who was also a pretrial detainee, incidentally) had vicious propensities or that Sheriff Bergeron should have known that they might harm any person who was placed in the cell with them.

Finding that plaintiff is unable to establish the right which he asserts, the court need not even discuss the qualified immunity that law enforcement officials are granted in Section 1983 actions. Here, plaintiff has not shown any violation of his rights by reason of the fact that Sheriff Bergeron did not require a separation of pretrial detainees from convicted persons in the West Baton Rouge Parish jail. Judgment will, accordingly, be rendered in favor of the Sheriff, dismissing plaintiff's claims against him.

## III.

### The Prescription Issue

The original complaint was filed in this Court on August 29, 1977, less than one year after plaintiff's injury on September 20, 1976. The complaint named Sheriff Bergeron and "John Doe," a deputy sheriff whose name was then unknown to plaintiff, as defendants. The complaint alleges that plaintiff requested Deputy "John Doe" to remove him to another cell on several occasions and that after it became obvious that plaintiff was in danger of serious injury from the other occupants of the cell, Deputy "John Doe" refused to remove him. Then the plaintiff alleges that he was attacked and injured by the other inmates and that this was caused by the gross negligence of Deputy "John Doe."

Deputy Pattan was identified during discovery as the deputy involved, and on December 17, 1978, plaintiff amended the complaint so as to specify Pattan's name in place of "John Doe." Pattan was, in fact, present in the jail on the night of plaintiff's injuries, and it is undisputed that he went to the cell at least on two occasions, that he broke up the fight, removed plaintiff and transported him to the hospital. Only one deputy sheriff, Deputy Pattan, fits the description in the original complaint of the person referred to as "John Doe." Consequently, all concerned knew or should have known that "John Doe" was, in fact, Pattan.

Both sides agree that, since Congress has not provided any limitation period for bringing actions under 42 U.S.C. § 1983, federal courts must look to and apply the law of the state. *Kissinger v. Foti*, 544 F.2d 1257 (5th Cir. 1977); *Proctor v. Flex*, 567 F.2d 635 (5th Cir. 1978).

Article 3536 of the Louisiana Revised Civil Code establishes a one-year prescriptive period for bringing actions of this nature, and the issue is whether Campbell's action against Pattan is prescribed because it was not filed until long after the one-year prescriptive period had elapsed.

 Under the law of Louisiana, filing a suit against one solidary obligor interrupts prescription against all (LSA–C.C. art. 2097). In Louisiana joint tort feasors are liable in solido and plaintiff has argued that the suit brought against Sheriff Bergeron interrupted prescription against Pattan as well. In view of the Court's finding of nonliability as to the Sheriff, there is no joint tort feasor here and thus no solidary obligor, hence, no interruption of prescription because of the filing of the suit against the Sheriff. Plaintiff argues, however, that Rule 15(c), Fed.R.Civ.P.[3] applies here and that his amendment adding Pattan relates back to the original complaint and should be considered as timely filed.

In view of the holding of the Court of Appeals in *Welch v. Louisiana Power and Light Company*, 466 F.2d 1344 (5th Cir. 1972), I am persuaded that plaintiff is correct. That case was a personal injury diversity action in which the plaintiff named several defendants in the original complaint and then named "ABC Mfg. Co." as the manufacturer of a defective bolt whose name was then unknown. Subsequently, and well after Louisiana's one-year prescriptive period had expired, plaintiff amended the complaint so as to allege the actual name of the manufacturer. The Fifth Circuit discussed whether Louisiana law or Rule 15, Fed.R.Civ.P., should apply and concluded that the federal law applied even in a diversity action. The matter was remanded to the district court for determination of whether the manufacturer had received notice of the sort required by Rule 15.

I conclude that if Rule 15 is to be applied in a diversity action in preference to Louisiana law, then clearly, federal law applies in an action brought under 42 U.S.C. § 1983 to assert rights granted by federal law.

Hence, we must determine whether Deputy Pattan had adequate notice of the filing and service of the original complaint upon Sheriff Bergeron. As noted, there can be no doubt that this complaint described Deputy Pattan in everything except his correct name and that anyone having familiarity with the incident and with the complaint would know that the "John Doe" specified was actually Pattan. Thus, anyone who received a copy of the complaint knew or should have known that, but for mistake concerning the identity of Pattan, the action would have been brought against him.

Sheriff Bergeron received the complaint well within the prescriptive period and admits that he told Pattan about the suit. Pattan also freely admits that the Sheriff informed him of the filing of the suit and apparently of the allegations of the complaint. Although the precise time of this development is not clearly established by the evidence, it was not very long after the Sheriff was served. The Court concludes that the preponderance of the evidence indicates that Deputy Patton did receive notice of the institution of the action prior to the running of the one-year prescriptive period and that such notice was sufficient so that he was not prejudiced in his defense of this action. There is nothing in the record to indicate that Pattan has been prejudiced in maintaining his defense, and clearly, he knew that the "John Doe" named in the original complaint was him.

---

3. Rule 15(c), Fed.R.Civ.P., in pertinent part, provides:

"Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against him, the party to be brought in by amendment (1) has received such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against him."

Thus, this Court holds that the amended complaint naming Patten relates back to the original pleading and that the action against Pattan has been timely filed.

## IV.

*Liability, on the Merits, of Deputy Pattan*

The plaintiff bases his case against Pattan upon the theory that Pattan knew or should have known that Campbell should not have been confined with convicted prisoners and that Pattan knew or should have known that the other inmates were likely to harm Campbell but Pattan did nothing to protect him. As noted, the Court has already found that no such constitutional right of separate confinement exists. The case against Pattan thus becomes one largely of negligence, which probably does not even fall within the confines of a Section 1983 claim. This is especially so in view of the Court's refusal to accept the plaintiff's pendent state law claims. Assuming *arguendo*, however, that plaintiff has a Section 1983 claim against Pattan, the Court finds no liability upon the facts.

Pattan, a "road deputy" who worked only on weekends, was present in the jail when Campbell and Welch were booked. He was there writing reports which were required as a normal part of his duties. Although he saw Campbell and Welch when they were brought in by the Port Allen police officers, he had nothing to do with their arrest or subsequent booking. He was not a jailer and had no responsibilities regarding the operation of the jail.

Campbell and Welch both claim that Pattan placed them in the cell. Pattan denied this and was corroborated by the jailer, Deputy Tullier. The Court believes Tullier and Pattan; Campbell and Welch are mistaken.

The testimony regarding the events which transpired in the cell is hopelessly in conflict. All five occupants testified and each gave a different version. Basically, however, Campbell and Welch claim that the other three inmates, without provocation, jumped on Campbell and beat him until Pattan stopped it. Apparently, Campbell was hit in the head with an object of some sort which did cause very serious injury to his eye. The other three inmates claim that Welch and Campbell were loud and aggressive and woke them up when they came into the cell, that Campbell was the aggressor and struck the first blow. Accounts vary as to how many were actually involved in the brawl, but one thing is clear, Welch had no trouble with anyone; he simply laid down on his mattress on the floor.

The evidence establishes that Campbell had words with one or more of the other occupants and that someone banged on the cell door. The jailer, Tullier, asked Pattan to go and see what was going on in the cell. Pattan came to the cell, looked into it and saw Campbell and Matthews, each of whom was complaining about the other. Campbell did indicate that he "wanted out." Pattan, however, took that to mean that he wanted out of jail since Pattan had overheard Campbell complaining about being arrested earlier that evening. No threats were made and no one advised Pattan that he was in fear of physical harm. Pattan told the occupants to be quiet and go to sleep. A short time later Pattan heard noise in the cell, went to it and found Campbell fighting with the others (excluding Welch). As related earlier, Pattan stopped the fight and took Campbell to the hospital.

Some of the inmates claim that Pattan was called back to the cell on three occasions rather than two. The evidence does not preponderate to establish that but it really makes little difference since, under either version, Pattan did not violate any duty owed to Campbell.

■ Under any standard of conduct, whether under 42 U.S.C. § 1983 or under the law of negligence, Pattan is not liable. There was nothing to suggest to him that Campbell was likely to sustain injury, and Pattan could not reasonably have anticipated such injury. The Court is strongly inclined to the view that Campbell was actually the aggressor himself, particularly, be-

cause of Welch's testimony regarding Campbell's "salty" attitude and the fact that Welch, on his mattress, was completely unmolested and unharmed. Such a finding is not, however, necessary to a resolution of the liability of Deputy Pattan because, regardless of who was the aggressor, Pattan had no reason to anticipate that Campbell would suffer injury at the hands of other inmates while he was in the cell.

Pattan's actions were reasonable in every respect and, for the reasons stated above, judgment will be rendered in favor of Pattan and against plaintiff.