**William M. GOODSON,
Plaintiff-Appellee,
Cross-Appellant,
v.
CITY OF ATLANTA and J.D. Hudson,
Defendants-Appellants,
Cross-Appellees.**

**William M. GOODSON,
Plaintiff-Appellee,
v.
CITY OF ATLANTA and J.D. Hudson,
Defendants-Appellants.**

**Nos. 83–8614, 84–8102.**

United States Court of Appeals,
Eleventh Circuit.

June 25, 1985.

Rehearing and Rehearing En Banc
Denied Aug. 2, 1985.

---

Marva Jones Brooks, W. Roy Mays, III, Alford J. Dempsey, Jr., George R. Ference, Atlanta, Ga., for City of Atlanta and J.D. Hudson.

Clifford H. Hardwick, Dorothy M. Primm, Atlanta, Ga., for William M. Goodson.

Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS *, District Judge.

ATKINS, District Judge:

William M. Goodson (Goodson) filed a complaint alleging that he was wrongfully arrested, his automobile unlawfully searched and seized, and he was confined by the City of Atlanta Police Department in violation of his constitutional rights under 42 U.S.C.A. § 1983. At the close of Goodson's case, the trial court granted the City's motion for a directed verdict on the claims for wrongful arrest and illegal search and seizure.

The case went to the jury only on the issues of the conditions of the Goodson's confinement as a pretrial detainee in the Atlanta City Jail. The jury returned a verdict upon which a judgment was entered for Goodson against the appellant City of Atlanta (City) and J.D. Hudson, (the Jail Supervisor), in the amount of $45,000.00 in compensatory damages, and against J.D. Hudson (Hudson) in the amount of $5,000 punitive damages. After an evidentiary hearing in a post-trial application by Goodson for attorney's fees and expenses, under 42 U.S.C. § 1988, the district court awarded $13,376.25. The City and Hudson appeal from that verdict and judgment and the award of attorney's fees and expenses. Goodson cross appeals from the directed verdict against his claims for the alleged injuries he suffered during the arrest and predetention activities involving personnel for the City of Atlanta Police Department.

We conclude the district court did not err (a) in directing verdicts, (b) in instructing the jury as to custom, policy, and procedure of the City, and (c) in refusing to charge the jury as to liability for employee violation of established procedure. The evidence supported the jury verdict. The

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

Court did not abuse its discretion in the award of attorney's fees and expenses. Accordingly, we affirm.

## The Facts

During the afternoon of October 19, 1980, Goodson was returning home in his automobile from a desert restaurant. He became concerned while driving when he noticed a couple in a car following him. His first thought was that perhaps these were some former students of his since he had taught high school and college for many years prior to that time. When he realized that he did not know the occupants of the automobile following him, he decided to stop at a nearby bookstore and telephone the police. He was unable to find a telephone and left the bookstore. The couple continued to follow him in their car. In his rear view mirror, Goodson observed the couple summoning a uniformed officer in a police patrol car. The next thing he knew the police officer signaled him to stop, asked him if he had a police record, and if he was carrying a weapon. The officer then conducted a *Terry* type pat down search. Goodson was asked to drive to a nearby bank parking area. He fully cooperated with the request.

When Goodson arrived at the North Fulton Bank, the officer asked him to get out of his car and placed him inside the back of the police patrol car. The officer did not have an arrest warrant. He then began to make a thorough search of Goodson's auto including the glove compartment and trunk. Goodson testified at trial that he did not consent to the search and the officer (Betts) also confirmed the fact that no consent to the search was given by Goodson. Officer Betts, in his testimony at trial, stated that this search was an inventory search pursuant to the policies of the City of Atlanta Police Department and that consent was not necessary.

During the time Goodson was confined in Officer Betts' patrol car, Goodson was never informed of any charges against him or of the reason for the search of his automobile. Shortly thereafter, Detective Jackson arrived after being summoned by radio. He had been told that the person detained was suspected of having committed rape.

One of the persons in the auto which had followed Goodson, Sandra Brooks (Brooks), identified Goodson as the man who had raped her sometime earlier. Officer Betts said she reported she had been raped two weeks earlier, but records in the custody of the City of Atlanta indicate Brooks had reported the rape as occurring on June 4, 1980 (four months earlier).

After Detective Jackson arrived at the North Fulton Bank, he handcuffed Goodson and placed him in the back of his unmarked police vehicle. Goodson was then first informed of the charges against him. Goodson insisted that he could not possibly have raped Brooks because he was a retired school teacher who did not drive at night. At no time did Detective Jackson attempt to question Goodson about his version of the facts. While he was being detained by Officer Betts, Goodson attempted to find out why he was being held and was told to "keep your God damn mouth shut, I've got a job to do."

Goodson's automobile was impounded by the Atlanta Police Department. While the auto was in the possession of the police department, the front and rear windows of the auto were painted with the charges "sex offender."

Detective Jackson's preliminary investigation consisted chiefly of locating Sandra Brooks' file. At the time of Brooks' rape she reported being raped by a man who was driving an orange car with a white top. She described him as being about 55 years old and tall with a big build. Goodson is six feet tall, weighs 155 pounds, and at the time of the alleged rape, was 66 years old. He drives a 1973 Plymouth Scamp that is gold in color. The alleged rape occurred at night. Goodson argues that this description points out discrepancies between the alleged rapist and Goodson. The City and Hudson argue the description is enough for the officers to have found probable cause to arrest Goodson.

Based on Brooks' identification and the description in the file, the officers arrested Goodson. After his arrest, Goodson was placed in the custody of the Atlanta City Jail. He was first placed in a holding cell and remained there for several hours. While in the holding cell he complained of severe sinus headaches and asked for aspirin to relieve his pain. His request was refused and the guards would not allow another inmate to donate aspirins to him.

Some time after 7 p.m., Goodson was carried up to a regular cell. He was never given a change of clothing, nor was he given the bare minimum bedding, such as sheets and blankets. The cell in which he was placed had broken windows which let in cold air and the other elements of mid-October. The cell was unheated. The food he was served was roach infested.

The next morning Goodson's inmates summoned the guards and told them Goodson was sick. They wanted to know why the guards did not take him to the hospital. The response was: "I hope the son of a bitch dies." After continued requests Goodson was taken to the hospital at 4 p.m.

While waiting to be transported to the hospital, a guard started to fill out a report. Goodson told him he had the flu. The guard grabbed a can of roach spray and sprayed Goodson in the face and on other parts of his body. The City and Hudson contend that this was not admitted into evidence.

Thereafter, Goodson was carried to Grady Hospital and placed in a jail cell which was still under the custody and control of the Atlanta Police Department and Bureau of Corrections. The cell was a concrete room with no heat, no water and no toilet facilities. The only furniture in the cell was a hard bench. Goodson was confined in that room from approximately 4:30 p.m. until midnight, a period of about eight hours. During that period of confinement he was given neither food nor drink. In order to alleviate his hunger Goodson asked guards to get him some peanut butter and crackers out of the vending machine and offered money to pay for this food. This request was refused.

Goodson, suffering from chills and fever, requested from one of the guards a blanket for protection against the cold. The response to his request for a blanket was "Don't worry about it, when you freeze we will haul your dead ass out."

Sometime after midnight, Goodson was taken out of the cell, carried down a hall and handcuffed into a wheelchair for approximately one and one-half hours. During this period of time another patient vomited on Goodson, and the guards required him to stay handcuffed in the wheelchair with the vomit on his person. They would neither allow him to clean himself up, nor did they make any effort to clean him.

While he was at Grady Hospital, Goodson saw a doctor. He was not given a physical examination nor did the doctor make any effort to determine Goodson's exact medical problems. The sole treatment consisted of pills to relieve the headache. Afterwards Goodson was returned to the concrete room and kept until approximately 2:00 a.m., whereupon he was walked back to the jail. During the entire time of this "medical treatment," which began at 4:00 p.m. Monday afternoon and lasted until approximately 7:00 a.m. the following day, Goodson was given neither food nor water.

When he returned to his cell, Goodson was still without blankets or bedding. On Tuesday morning October 21, he again asked for some blankets. The guards response was "We don't have any blankets, all I can give you is a mattress cover."

On Wednesday, Goodson could not eat the food that was served to him because he found it inedible. He found a roach inside his coffee. When informed that he would have a preliminary hearing that afternoon his request of the guards to be allowed to take a shower and shave were denied. During the entire period of his confinement in the Atlanta City Jail, Goodson was never allowed to take a shower or to bathe himself in any manner.

While awaiting the preliminary hearing, Goodson was placed in a cell with a toilet that overflowed in the cell, and there were feces on the floor. He requested to be removed to another room. This request was granted, however, all of the holding cells had the same common problem, overflowing toilets and feces on the floor.

After the preliminary hearing on Wednesday, Goodson was transported to the Fulton County Jail where for the first time since his arrest on Sunday, he was given bedding, and allowed to take a shower and groom himself. Finally, on Friday evening, Goodson was allowed to be released from custody on bond.

On Saturday he went to the impound lot to recover his automobile which had been impounded by the Atlanta Police Department since the preceding Sunday. He discovered that the front and back windows of his car had been painted with the words "sex offender." Goodson was forced to drive from the impound lot through metropolitan Atlanta to his home with his car branded with the words "sex offender." He had never been tried or convicted of any such offense.

### The Arrest

■ Probable cause exists only when the facts and circumstances are sufficient to warrant a prudent person in believing that a suspect has committed or was committing a crime. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Henry v. United States,* 361 U.S. 98, 102, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959). While the arrest was not a model one, we find a prudent person could have suspected that Goodson was the rapist based on Brooks' description and identification. Goodson's reliance on *Whiteley v. Warden, Wyoming States Penitentiary,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971) is misplaced. The officer was confronted with what he could not ignore, Brooks' personal identification. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). This places no imprimatur on the officer's abusive conduct and failure to inform

Goodson at the very beginning as to the charge leveled against him.

We find no error in granting the motion for a directed verdict on the claim for wrongful arrest.

### The Search and Seizure of the Automobile

■ An inventory search when an automobile is impounded by a police department has been authorized. *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). This is done for the purpose of protecting the owner's property and to protect the police against claims of lost or stolen property. The policy of the Atlanta Police Department comported with this objective.

Goodson relies upon *United States v. Edwards,* 554 F.2d 1331 (5th Cir.1977) in his attack on the method and manner of the search of his automobile. However, he ignores the en banc vacation and reversal of the panel's holding in which it ruled that the inventory search in *Edwards* by the police officer was reasonable and proper pursuant to *Opperman, supra; United States v. Edwards,* 577 F.2d 883, 893–895 (5th Cir.1978), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978).

The district court properly denied recovery on the claim for unlawful search and seizure by granting the motion for directed verdict on this ground.

### The Jury Verdict

The evidence was sufficient to warrant the jury's conclusion as reasonable persons that Goodson was denied his rights to due process of law in violation of the Fourteenth Amendment and subjected to cruel and unusual punishment as is prohibited by the Eighth Amendment. *Thompson v. Bass,* 616 F.2d 1259, 1267 (5th Cir.1980).

■ Pretrial detainees in their status of being presumptively innocent are entitled to humane and reasonable treatment. *Campbell v. McGruder,* 580 F.2d 521, 527 (D.C.Cir.1978); *Feeley v. Sampson,* 570 F.2d 364 (1st Cir.1978); *see also, Detainees*

*of Brooklyn House of Detention for Men v. Malcolm,* 520 F.2d 392, 393 (2nd Cir. 1975).

In summary, Goodson complains of inedible food, no blankets or bedding, no sanitation, inadequate medical care, no shelter from the elements other than a concrete cell with broken windows permitting the passage of cold air, together with such unsanitary conditions and deprivation of rights as to endanger his health. The City's only defense was that a new jail was being constructed and that Goodson, along with his fellow inmates, would merely have to suffer the inconveniences until the new facility could be completed. Even sentenced prisoners are to be furnished, as an obligation under the Eighth Amendment, with adequate food, clothing, shelter, sanitation facilities, medical care and personal safety. *Detainees of Brooklyn House of Detention for Men v. Malcolm, supra.*

### The Policies, Practices, and Customs of the City

■ The evidence disclosed that the City had a history of sanitation problems in the City jail. Johnny Williams, a former employee of the Atlanta Bureau of Corrections, had been Inspector Sergeant in the Bureau. Mr. Williams reported his findings to Hudson in 1979. Williams testified:

The jail was in a deplorable state, the toilets, the other fixtures of the jail were running over with human feces, and windows were broken out. Officers were not doing their jobs pertaining to making sure that daily operations of the jail pertaining to the inmates cleanliness, like giving them a bath, allowing them to shave, giving medical attention were not being administered to. We were getting quite a lot of complaints and it was just a deplorable, horrible conditions.

These conditions were still in existence during Goodson's confinement.

There is also testimony that the City had trouble acquiring its license from the State Inspector due to the unsanitary conditions and that when it did receive its license in 1979, it was warned by the State Inspectors

that if the conditions were allowed to deteriorate again, the permit would be withdrawn. According to Williams, he informed Hudson of irresponsible correctional officers and requested the discipline of the same. Hudson refused to discipline the officers under his command for violations of policy. Williams further testified that there were several complaints lodged about prisoners who had requested medical attention and had not received it. These complaints were brought to the attention of Hudson, who again refused to take any action to correct the situation. Williams testified that he was fired when he refused to "cover up" the death of an inmate due to the negligence of a personal friend of Hudson. The death of the inmate resulted from the denial of medical attention. Williams also testified about previous incidents, prior to those involving Goodson, of inmates who had been sprayed with either bug spray or some sort of disinfectant. One inmate had died from such a situation and this information also had been reported to Hudson. Williams testified that prior to and after his termination he had informed various officers of the City of Atlanta of unhealthy conditions at the Bureau of Corrections. Williams contacted the Public Safety Committee, the Mayor of Atlanta, Mr. Arrington, President of the City Council, and Ms. Mary Davis, Chairperson of the Public Safety Committee. All of these persons ignored his reports and requests for investigation of the conditions at the Atlanta City Jail.

The testimony of Mr. Williams is corroborated by Goodson's Exhibit 30. This exhibit is a copy of a letter from Defendant Hudson in response to complaints from Leamon Hood, area director of the guards' union. The union had also complained to Defendant Hudson about his acts of favoritism, inadequate supervision, and sexual harassment. The complaints of Hood were made during 1980 prior to Goodson's confinement.

During the testimony of Ms. Mary Davis, Chairperson of the Public Safety Committee, she admitted that in 1981 a probe was

conducted into the operations at the City Jail. The probe was initiated due to the complaints of the congregation at the Haygood Methodist Church and Reverend Childers. As the result of that probe Ms. Davis testified that:

> It is common public knowledge that the old building was not an adequate space and I think everybody on the Council knew that.

She further testified that she "expressed concern about the degree of staffing." She admitted, however, "I can't say that action was taken." It thus appears that the City Council ratified the customs, policies, and procedures of the Director J.D. Hudson during the time period immediately after and prior to the incidents complained of by Goodson. Ms. Davis also testified that she, while serving as the Chairman of the Public Safety Committee, had been approached by not only Mr. Williams, but also by Mr. Hood who expressed their concerns about the conditions of the Atlanta City Jail.

In addition to Ms. Davis's testimony Goodson called Marvin Arrington who had been President of the City Council for the City of Atlanta during the time involved. Mr. Arrington confirmed that in 1981, he had called for a probe of the conditions at the City Jail and that he had made the public statement:

> I have been concerned for a great deal of time about the whole situation at the jail, you have theft, you have women being raped, you have inmates escaping, and now we have a young man being strangled to death.

During Mr. Arrington's testimony, Goodson introduced Exhibit 28 which is a copy of the City Ordinance setting forth the job description of the position held by Hudson. As recited in Exhibit 28, Hudson is responsible for making weekly inspection reports to the head of the Council. Arrington testified that Hudson violated the City Ordinances and did not make the reports required by law.

■ There is credible evidence, both from the testimony of witnesses and physical evidence submitted at trial, that the City and Hudson knew of the unsanitary conditions, showed disregard for the health, welfare or human rights of the inmates by the guards, and were aware of the type of treatment the prisoners were receiving in the City of Atlanta Jail. There is also evidence that the City and Hudson either ratified these acts or condoned them to such a degree that they became part of the policy, custom, practice, and procedure of the City and Hudson. We find that the policy, practices and customs of the City violated Goodson's constitutional rights.

### The Evidence Supports the Jury Verdict against Hudson

The record discloses that Hudson made public statements to the news media that the City (of Atlanta) jail is unfit for human habitation.

The City Ordinance in evidence (§ 11–5002(b)) delineates the powers and duties of Director Hudson. It includes provisions requiring him to make weekly reports to the Commissioner regarding, among other things, the number of offenders and complaints, the serving of food, and the condition of clothing, bedding and buildings as to their cleanliness and sanitation. The ordinance also imposes direct responsibility upon the Director for all persons under his jurisdiction, the medical treatment, food, clothing, bedding, cleanliness, sanitary conditions of the inmates in the facilities. §§ 11–5001–5008. It thus follows that Hudson had a duty properly to train and supervise the guards and supervise the facilities to prevent the deprivations of which Goodson complains.

Hudson was aware, on or before July 22, 1980, of complaints by International Union Area Director Leaman of sexual harassment, inadequate supervision, and favoritism. Likewise, the City Manager and Hudson were, for several years prior to Goodson's incarceration on notice of the existence of prisoner abuse and the lack of sanitary conditions at the City Jail.

■ Hudson need not have had personal participation or involvement in the acts of the employees to be held liable. As a supervisor, his failure (a) to train subordinates and to establish procedures for protection of constitutional rights and (b) to take action against violations of which he had notice can be a basis for liability. *See, McCann v. Coughlin,* 698 F.2d 112 (2nd Cir.1983); *Orpiano v. Johnson,* 632 F.2d 1096 (4th Cir.1980); *McClelland v. Facteau,* 610 F.2d 693 (10th Cir.1980); *Davis v. Zahradnick,* 600 F.2d 458 (4th Cir.1979); *Dewell v. Lawson,* 489 F.2d 877 (10th Cir. 1974); *Beverly v. Morris,* 470 F.2d 1356 (5th Cir.1972); *Roberts v. Williams,* 456 F.2d 819 (5th Cir.1971); *Wright v. McMann,* 387 F.2d 519 (2nd Cir.1967).

■ The evidence shows that Hudson failed in his duties as Director and as a proximate result, Goodson's constitutional rights were violated. We find that evidence supports the verdict against Hudson on this issue.

### The District Court Properly Refused To Give Requested Charges

■ The City urges that the district court erred in not giving its requested charge, number nine, as to the definition of custom. The test to be applied is whether, viewing the charges as a whole, the jury was adequately instructed on the law. *United States v. Abravaya,* 616 F.2d 250 (5th Cir.1980). Examination of the entire charges does not support the City's contention. The jury was instructed adequately on what constituted a policy, custom or practice of the City. We find no error in failing to give the City's requested charge number nine. *See, Mannke v. Benjamin Moore & Co.,* 375 F.2d 281 (3rd Cir.1967).

### Failure to Give Requested Charge No. 10

■ The City requested the court to charge the jury that it could not be held liable for employees' unauthorized failure to follow the City's established policies. While this is a correct statement of the law, *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), there was no factual basis or necessity for giving this instruction. The court properly had instructed the jury that neither the City nor Hudson was liable for the assault upon Goodson by spraying him with roach spray. There was no issue concerning employee's unauthorized failure to follow established procedures. To have instructed the jury as proposed would have been error since the issue was neither tendered by the pleadings nor raised by the evidence. *Smith v. Ellerman Lines, Ltd.,* 247 F.2d 761 (3rd Cir.1957). We find no error in the refusal to give charge number 10.

We affirm the jury verdict.

### The Award of Attorney's Fees and Expenses

■ The City and Hudson asserted that the court abused its discretion in the amount of attorney's fees and expenses awarded Goodson because it did not exclude the work done on unrelated, unsuccessful claims as required by *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The City's and Hudson's main argument centers around two separate and distinct claims. These were (1) the wrongful arrest and search, deprivation of counsel during interrogation, failure to take Goodson before a magistrate, and non-disclosure of the charges and (2) unconstitutional conditions of confinement in the City of Atlanta jail. The trial court dealt precisely with this contention in this language:

The Plaintiff originally complained of false arrest and imprisonment and of Fourth Amendment violations based on misidentification as the perpetrator of a crime. These claims were dismissed. The Plaintiff prevailed though, on his claim for damages arising out of jail conditions. Although the Defendant urges that the facts relating to the Plaintiff's arrest and imprisonment were not essential to his jail conditions case, and the Plaintiff should therefore not be able to recover fees for the time his attorneys spent developing these facts, the court

finds that a good trial lawyer would have tried to get into evidence that this client was arrested and jailed because of a mistaken identification. The court will not reduce the award of fees because the false arrest and imprisonment claims were dismissed.

We do not find the trial court abused its discretion in applying this *Hensley* factor in making the award.

The district court also found that the hours shown in the affidavits of Goodson's counsel "are so obviously reasonable, the rate charged per hour," on balance "quite fair" and fees and expenses (with one excluded exception) "fair and reasonable." These findings were within the sound discretion of the trial court and supported by the record. *Metcalf v. Borba,* 681 F.2d 1183 (9th Cir.1982); *see also, City of Riverside v. Santos Rivera,* 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1310 (1983).

Counsel was required to be fully aware of all the circumstances and to explore and develop every aspect of this case. *Williams v. City of Fairburn, Georgia,* 702 F.2d 973 (11th Cir.1983). *Hensley* teaches that the most critical of its factors is the degree of success obtained. The result meets that test. The court appeared to have applied the relevant factors of *Hensley.* The City and Hudson were given an evidentiary hearing to examine the records and to explore the issues.

We find no abuse of discretion and AFFIRM the award of fees and expenses.