Robert WRIGHT, Sr., individually and as Administrator of the Estate of Robert Wright, Jr., and for the benefit of his next of kin; and Ruby Wright, individually, Plaintiffs,

v.

Lamar WHIDDON, individually and as Sheriff of Turner County; Turner County, Georgia; City of Ashburn, Georgia; J.I. Youngblood, individually and as Mayor of the City of Ashburn; Elbert Bean, individually and as Chief of Police of the City of Ashburn; and Scotty Ireland, individually and as a Police Officer of the City of Ashburn, Defendants.

Civ. No. 87–77–ALB/AMER(DF).

United States District Court, M.D. Georgia, Albany/Americus Division.

Sept. 10, 1990.

Larry B. Mims, Tifton, Ga., Willie Abrams, Asst. Gen. Counsel, NAACP Special Contribution Fund, Baltimore, Md., for plaintiffs.

Peter Zack Geer, Edgar B. Wilkin, Jr., Albany, Ga., George M. Peagler, Jr., O. Hale Almand, Jr., Macon, Ga., for defendants.

FITZPATRICK, District Judge.

Plaintiffs Robert Wright, Sr. and Ruby Wright filed the above styled complaint pursuant to 42 U.S.C. § 1983 to recover damages for the wrongful death of and deprivation of rights held by plaintiffs' decedent, Robert Wright, Jr., under the fourth, fifth, and fourteenth amendments to the Constitution of the United States and under the laws of the State of Georgia. Plaintiffs subsequently agreed to dismiss defendant J.I. Youngblood, individually and as Mayor of the City of Ashburn, and decided not to pursue their fifth amendment and state law claims against the defendants. The remaining defendants answered plaintiffs' complaint and then filed motions for summary judgment which the court will now address.

## FACTUAL BACKGROUND

On or about September 2, 1985, Robert Wright, Jr., (hereinafter "Wright" or "decedent") was charged with the armed robbery of a convenience store and incarcerated in the Turner County jail in Ashburn, Georgia. Whiddon Dep., p. 22. As a prisoner in that jail, Wright was in the custody and control of defendant Lamar Whiddon, Sheriff of Turner County, Georgia.

On September 30, 1985, Wright was transported from the Turner County jail to the Turner County courthouse to attend a probation revocation hearing concerning the armed robbery charge. Wright was never handcuffed during the trip from the jail to the courthouse which took place without incident. Georgia Bureau of Investigation Official Investigation file (G.B.I. file), exh. 9. Shortly after Wright was brought into the courthouse and seated in the courtroom without handcuffs or any other kind of restraining device, Whiddon instructed the Turner County deputy who was guarding Wright to go investigate an armed robbery in progress on the nearby interstate highway. G.B.I. file, exh. 9; Whiddon Dep., pp. 16–19. The deputy left to investigate the incident leaving Wright in the custody of Whiddon. Defendant Whiddon then told an unarmed seventy-one year old court bailiff to keep an eye on Wright as Whiddon proceeded out of the courtroom into the judge's chamber to inform the judge of the armed robbery in progress. Whiddon Dep., pp. 17–18.

While Whiddon was in the judge's chambers with the judge and defendant City of Ashburn police officer Scotty Ireland, Wright began his escape attempt by slipping out of the courtroom and then dashing into the street. Affidavit of Dorothy Joe Bean, pp. 1–2. The screams of clerk of the court Dorothy Joe Bean that Wright was escaping alerted defendants Whiddon and Ireland, who immediately gave chase. Ireland Dep., p. 28; Whiddon Dep., p. 17. By the time Whiddon and Ireland exited the courthouse, however, Wright, who was unarmed, had already crossed the street and was running down an alley in the direction of a hardware store and a center for mentally retarded persons. G.B.I. file, exh. 5. Wright had not attacked or threatened anyone during his escape attempt and was on

the threshold of eluding immediate capture by Whiddon and Ireland when Ireland drew his gun while defendant Whiddon yelled "shoot" or "shoot him" and fired one shot which struck and mortally wounded Wright. Ireland Dep., p. 30; Whiddon Dep., p. 17. Minutes later, Wright was transported by ambulance to the Turner County Hospital and soon thereafter died in an ambulance en route to a second hospital.

Wright's past reveals an individual who had broken the law on numerous occasions. In 1982, Wright was accused of shooting a twelve gauge shotgun at a man after which he pled guilty to the charge of illegally discharging a weapon. Affidavit of Scotty J. Ireland, p. 2. Two years later Wright was convicted of the felony offense of burglary for breaking into a home and stealing a twelve gauge shotgun and a pistol. *Id.* Additionally, at the time of his escape, Wright was being held under arrest for the armed robbery of a convenience store where a gun was used in the commission of that felony. Affidavit of James Davis, exh. A, pp. 11–20.

Defendants Whiddon and Ireland were both familiar with Wright's criminal history and his reputation for being a "runner" —a slang term used to describe someone who is known for trying to escape from custody. Whiddon Dep. pp. 12–13; Bean Dep., pp. 37–39. Whiddon was aware of Wright's criminal activities and reputation as a result of carrying out his duties as Sheriff of Turner County. Ireland knew Wright from numerous encounters with him including his arrest of Wright on two separate occasions when Wright was charged with the above mentioned burglary and convenience store robbery. On the occasions Ireland arrested Wright, he never drew his gun or found the need to use any force in apprehending Wright; nor did Wright ever offer any resistance. Ireland Dep., pp. 14–22.

Defendants Whiddon and Ireland had both attended the 240 hour Basic Mandate Training Course that all State of Georgia police officers must take which included educational instruction concerning the use of deadly force in accordance with state law. Whiddon Dep. pp., 7–10; Ireland Dep., pp. 22–23. The statute in force in Georgia on September 30, 1985 concerning the use of deadly force in defense of self or others, O.C.G.A. § 16–3–21, provided in pertinent part as follows:

(a) A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat or force is necessary to defend himself or a third person against such other's imminent use of unlawful force; however, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily injury to himself or a third person or to prevent the commission of a forcible felony....

(c) Any rule, regulation or policy of any agency of the state or any ordinance, resolution, rule, regulation, or policy of any county, municipality, or other political subdivision of the state which is in conflict with this Code section shall be null, void, and of no force and effect.

The City of Ashburn's police department rules and standards relating to the use of deadly force provide in pertinent part that:

Members of the Department who are authorized by law to carry firearms shall exercise the utmost care and precaution in the preservation and use of such weapons.

Section 1. No member of the Department shall use firearms in the discharge of his duty, except in the following cases:

a. In self-defense, or to defend another person (unlawfully attached [sic]) from death or serious injury.

b. In effecting the arrest or preventing the escape, when no other means are available, of any felon or person whom the officer has probable cause to believe has committed a felony....

## DISCUSSION

Rule 56(c) of the Federal Rules of Civil Procedure allows for the granting of summary judgment when "the pleadings, depo-

sitions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Upon motion and after adequate time for discovery, Rule 56(c) mandates the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). A movant may discharge his burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 326, 106 S.Ct. at 2554.

"To survive a motion for summary judgment, a plaintiff need 'only present evidence from which a jury might return a verdict in his favor. If he does so, there is a genuine issue of fact that requires a trial.'" *Samples on Behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988) (citations omitted).

■ In evaluating a summary judgment motion, the evidence and all factual inferences must be viewed in the light most favorable to the nonmovant. *Thrasher v. State Farm Fire & Casualty Co.*, 734 F.2d 637, 638 (11th Cir.1984). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion." *Samples on Behalf of Samples*, 846 F.2d at 1330.

*Defendant Ashburn City Policeman Scotty Ireland*

"The first inquiry in any § 1983 suit ... is whether the plaintiff has been deprived

of a right 'secured by the Constitution and laws.'" *Baker v. McCollan*, 443 U.S. 137, 141, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979) (citation omitted). Such an inquiry in the instant case leads the court to an initial investigation of the plaintiffs' claim that defendant Scotty Ireland used excess force against decedent Robert Wright, Jr., which deprived him and the plaintiffs of their constitutional rights.

■ Before deciding if the decedent and plaintiffs have in fact been deprived of any constitutional rights, the court must determine what constitutional standard governs the plaintiffs' claim that the decedent was subjected to the unconstitutional use of excess force. Plaintiffs asserts that the fourth amendment provides the applicable standard upon which their claim should be judged, Plaintiffs' Brief in Opposition to Defendants Scotty Ireland's and Lamar Whiddon's Motions for Summary Judgment, while defendant Ireland argues that the eighth amendment serves as the standard under which plaintiffs' claim should be analyzed. Defendant Scotty J. Ireland's Brief in Support of Motion for Summary Judgment. The Supreme Court has clearly stated that the fourth amendment is applicable in the case of excess force allegedly used against a fleeing felony suspect, *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), while in the case of excess force allegedly being used against a convicted prisoner, the Eighth Amendment "serves as the primary source of substantive protection ..." *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078, 1088, 89 L.Ed.2d 251 (1986). The Supreme Court has specifically declined, however, to indicate the applicable standard under a factual situation analogous to that of the instant case.[1]

1. *See Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 1871 n. 10, 104 L.Ed.2d 443 (1989) ("A 'seizure' triggering the Fourth Amendment's protection occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen, ...' [citations omitted].

Our cases have not resolved the question whether the Fourth Amendment continues to

provide individuals with protection against the deliberate use of excessive physical force beyond the point at which arrest ends and pretrial detention begins, and we do not attempt to answer that question today."

Perhaps the Court's statement in *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985), indicates, however, the Court's preference when it states that "[w]hile it is not

The court finds that the better course to follow is that advocated by the plaintiff because a pretrial detainee has the status of a presumptively innocent individual, *Goodson v. City of Atlanta,* 763 F.2d 1381, 1386 (11th Cir.1985), and is therefore more akin to a suspect than a convicted prisoner.[2] Accordingly, plaintiffs' claims will be analyzed under the Fourth Amendment's objective reasonableness standard.

■ "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Rather, "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at ——, 109 S.Ct. at 1871–72. "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner,* 471 U.S. at 11, 105 S.Ct. at 1701. On the other hand the court must consider and make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at ——, 109 S.Ct. at 1872. In the final analysis, the Fourth Amendment reasonableness inquiry in an excessive force case comes down to the objective question of "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.*

Defendant Ireland contents that his use of deadly force to prevent Wright's escape, under the facts of this case, was objectively reasonable as a matter of law because the undisputed facts demonstrate that he had probable cause to believe that Wright posed a threat of serious physical harm to others. According to Ireland, probable cause existed because of Wright's past criminal record that evidenced a dangerous individual likely to inflict serious physical harm on others.

Ireland knew that Wright had previously been convicted of illegally discharging a weapon and burglary. Affidavit of Scotty J. Ireland, p. 5. Ireland himself had also recently arrested Wright on charges of armed robbery of a convenience store which Wright confessed to committing. Ireland Dep., pp. 15–17, 21–22. These past acts of Wright led Ireland to conclude that Wright's violent seizure was necessary to prevent the infliction of serious physical harm on others. Affidavit of Scotty J. Ireland, p. 5. The court finds, however, that despite Wright's past criminal acts, evidence pertaining to the manner in which Ireland and other law enforcement officials dealt with Wright before his escape attempt, creates a genuine issue of a material fact concerning whether it was objectively reasonable in this case to believe that the amount of force used was necessary to prevent Wright from causing serious physical harm to others.

The evidence in this case shows that previous attempts to apprehend Wright were

always clear just when minimal police interference becomes a seizure, [citation omitted], there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."

**2.** Support for applying the fourth amendment reasonableness standard can also be found in *Clark v. Evans,* 840 F.2d 876, 880 n. 4 (11th Cir.1988), where the Eleventh Circuit assumed without expressly deciding that "the *Garner* principle of law, which was announced in the context of the seizure of a felony *suspect* and the Fourth Amendment ramifications thereof, applies with equal force and would also clearly establish the law in the different context of a *prison* escape and the Eighth Amendment ramifications thereof." Although the Supreme Court's subsequent decision in *Graham* determined that fourth amendment coverage is not applicable in an excessive force case brought by a prisoner, there is no reason to believe that the Eleventh Circuit would retract its broad coverage of fourth amendment protection any further than mandated by the Supreme Court.

successfully accomplished without the need to use any force whatsoever. On one occasion, after Wright had burglarized a home and stolen a twelve gauge shotgun and a pistol, defendant Ireland and two fellow Ashburn policemen approached and apprehended Wright without incident and without finding it necessary to draw their weapons. Ireland Dep., pp. 19–20. Another incident in which Ireland encountered Wright occurred after Ireland had received a complaint that Wright had stolen a nickel-plated .38 pistol from a convenience store in Ashburn. Based on that complaint, Defendant Ireland tracked down Wright and acting alone arrested Wright without ever drawing his weapon or using any force. Ireland Dep., pp. 18–19.

There was yet another occasion when defendant Ireland found it necessary to attempt to apprehend Wright after he had fled from the scene of a crime. On September 2, 1985, Ireland received a call informing him that an armed robbery had just taken place at a nearby convenience store. Once upon the scene, witnesses told Ireland and other officers that Wright was seen running from the store with a gun in one hand and a paper bag in the other. When Ireland and the other officers found Wright, approximately two hours later, he was sitting with a gun in the back seat of a car the policemen could not see into because of its tinted windows. Ireland Dep., pp. 14–17, 21–22. Nevertheless, the policemen approached the car, removed Wright from it and arrested him without ever drawing their guns or using any type of force. *Id.*

In each of the above mentioned arrests, Ireland had notice that Wright possessed a firearm, yet Ireland never felt the need to approach Wright with his gun drawn nor the need to use any force whatsoever to apprehend Wright. Contrarily, the one time Ireland seeks to apprehend Wright when it is reasonable to assume Wright is unarmed, Ireland finds it necessary to use the highest degree of force available because he knows from his past encounters with Wright, which never involved the use of force, that Wright is a dangerous individual likely to seriously harm others. Furthermore, when Wright had committed crimes in the past and escaped from the scene, Ireland had successfully tracked him down, usually within hours, and captured him without incident.

There are other facts concerning the manner in which Wright was treated before he was shot that could lead a reasonable jury to conclude that it was unreasonable to believe that Wright posed a threat to the safety of the officers or others as he dashed down the alley attempting to escape. When Wright was removed from his jail cell at the Turner County jail for transport to the courthouse, he was never shackled, handcuffed, or physically restrained in any manner. Affidavit of Dorothy Joe Bean. This individual who defendants claim posed a risk of inflicting serious harm to others was left without handcuffs in the care of a seventy-one year old unarmed bailiff as he sat in relatively close proximity to the judge's clerk of court. *Id.*

Ireland and other law enforcement personnel, charged with the duty of protecting the public from dangerous persons, treated Wright like an individual not likely to physically harm anyone before his attempted escape. However, after his escape attempt, these same law enforcement officials claim that they had concluded, before Wright's escape,[3] that he was a dangerous individual likely to cause serious physical harm to others. Viewing the facts concerning Wright's pre-escape treatment in the context of a summary judgment motion, the court finds that a reasonable jury could determine that the law enforcement officials' actions, rather than their after-

---

**3.** There are no assertions that anyone concluded that Wright posed a threat of serious physical harm to others based on his actions immediately prior to or during his escape attempt. Although Ireland contends that Wright was headed in the direction of a hardware store where he could obtain weapons and a mental retardation center where there were potential hostages, Ireland does not assert, nor does the evidence demonstrate, that Wright threatened anyone during his escape attempt or that Wright posed an imminent threat of serious physical harm to anyone when he was shot.

the-fact statements, demonstrate that Wright did not pose a threat of serious harm to others and that the officials did not honestly believe he did. That reasonable jury could therefore go on to decide that it was objectively unreasonable to believe that the amount of force used was necessary to prevent Wright from causing serious physical harm to others. Accordingly, the court finds the existence of a genuine issue of material fact concerning whether a reasonable officer would have probable cause to believe that the use of deadly force was necessary to prevent Wright from inflicting serious physical harm on others.

■ Defendant Ireland asserts that whether or not Wright and plaintiffs were deprived of constitutional rights, he nevertheless is protected from liability by qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In determining whether Ireland is entitled to qualified immunity in this case, the court finds that the same issue of material fact that precludes a finding of summary judgment regarding the alleged constitutional deprivations likewise presents an issue of material fact concerning whether or not Ireland is entitled to qualified immunity.

At the time Ireland shot Wright, the law was clearly established that the use of deadly force to prevent escape is justified only if the officer reasonably believes that such force is necessary to prevent death or serious physical injury to the officer or others.[4] *See Garner,* 471 U.S. at 12, 105 S.Ct. at 1701; O.C.G.A. § 16–3–21. Ac-

cordingly, applying the qualified immunity test in the context of Wright's alleged unlawful seizure, it must be determined whether a reasonable officer in the same circumstances and possessing the same knowledge as Ireland could have believed that probable cause existed to conclude that Wright posed an immediate threat to the safety of the officers or others. *See Von Stein v. Brescher,* 904 F.2d 572, 579 (11th Cir.1990); *see also Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987) (in determining whether defendant was entitled to qualified immunity, the court noted that "[t]he relevant question in this case, for example, is the objective (albeit fact-specific) question whether a reasonable officer could have believed [the alleged wrongful act] to be lawful, in light of clearly established law and the information the searching officer possessed.").

As discussed above, there are material facts in dispute that preclude the court from finding as a matter of law that defendant Ireland reasonably believed that the decedent posed a threat of serious physical harm to others. If a reasonable officer could believe that Wright posed a serious threat, then likewise under the clearly established law a reasonable officer could have believed his actions to be lawful. Contrarily, if a reasonable officer could not believe that Wright posed a serious threat, then under the clearly established law a reasonable officer could not have believed his actions to be lawful. Therefore, the very same issue of material fact that precludes resolving the constitutional deprivation issues on summary judgment also precludes a resolution of the qualified immunity question on summary judgment. Only after the fact-specific issue of reasonableness has been settled in this case by a jury, can the issue of whether Ireland is entitled to qualified immunity be determined. *See*

4. The Supreme Court handed down the *Garner* decision six months before defendant Ireland's use of deadly force against Wright. Furthermore, defendant Ireland received training from the Georgia Peace Officers Standard Training Commission (P.O.S.T.) which taught officers to use deadly force only in accordance with Georgia law which had standards similar to those

subsequently established in *Garner.* Georgia law made it exceedingly clear that the officer must reasonably believe that deadly force is necessary to prevent death or great bodily injury *and* that no other state, county, or municipality could prescribe any rules, regulations, or policies to the contrary. O.C.G.A. § 16–3–21(a), (c).

*Samples on Behalf of Samples*, 846 F.2d 1328, (Because of the numerous questions and issues of fact, the "reasonableness" of the police officer's use of force should be resolved after a full trial, rather than on summary judgement); *Clark v. Beville*, 730 F.2d 739 (11th Cir.1984) (Defendant's denial of qualified immunity was upheld in case in which the district court had the jury determine whether a reasonable officer under similar circumstances would have had probable cause to believe the victim had committed a particular offense and whether the degree of force used in relationship to the need presented was reasonable under the circumstances). *See also Anderson*, 483 U.S. 635, 107 S.Ct. at 3038 ("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action."). Accordingly, for the foregoing reasons, defendant Ireland's motion for summary judgment is DENIED.

*Defendants Turner County Sheriff Lamar Whiddon and Turner County*

█ The court will now address the summary judgment motions of defendants Turner County Sheriff Lamar Whiddon and Turner County. Plaintiffs allege that in giving the command to shoot the decedent, Whiddon intentionally authorized the commission of the unlawful act which resulted in the death and violation of the decedent's and the plaintiffs' constitutional rights. The undisputed facts and evidence in this case shows, however, that Whiddon did not have the authority to authorize the actions of Ireland nor did Ireland act pursuant to any command from Whiddon.

Defendant City of Ashburn police officer Ireland was under no duty to follow the commands of the Sheriff of Turner County. More importantly, the evidence demonstrates that Ireland was relying on his own training and the policy of the City of Ashburn when he made the decision to draw his gun and fire at Wright. In his deposition, Ireland responded to questions from plaintiffs' counsel concerning his decision to use deadly force as follows:

Q. [Plaintiffs' counsel] ... The situation you were faced with as you described up to this point of your arrest of Robert Wright for armed robbery until your showing up at the Courthouse to testify under subpoena and then your having heard that he was escaping, having chased him out to the street and seeing him go through the alley. I asked you the question whether or not you had pulled your revolver prior to Sheriff Whiddon saying "shoot him". And your answer was "Yes". You had pulled your revolver.

Mr. Almand [Ireland's counsel]: I think his answer was he was starting to pull it, if I'm not mistaken.

Q. You correct me if I'm wrong. Had you pulled your revolver?

A. I was pulling it.

Q. You think you were pulling it?

A. The best I remember, that's what I was doing.

Q. Based on the [City of Ashburn deadly force] policy, is it your understanding that you had the right to shoot him or to use deadly force to stop him?

A. Yes.

Q. And that's why you were pulling your revolver?

A. Yes.

Ireland Dep. pp. 32–34.

The foregoing testimony shows that Ireland had already decided that the City of Ashburn policy on the use of deadly force gave him the right to shoot Wright and had in fact begun to act based on that belief before Whiddon made his statement to shoot him. On the other hand, there is no evidence indicating that Ireland acted in accordance with or relied upon the command of Whiddon when he shot Wright. Rather, the evidence demonstrates that Ireland exercised his own independent judgment and formed his own opinion, based on his training and experience as a City of Ashburn policeman, that he had the right to shoot the fleeing decedent. Accordingly, the court finds that Ireland's subsequent act of shooting Wright was not done at the command of Whiddon nor in accordance with any policy, custom, usage, or

practice of Turner County. The summary judgment motions of defendants Whiddon and Turner County are therefore GRANTED as the court finds that there exists no genuine issues of material fact concerning the allegations that defendants Whiddon and Turner County deprived Wright and plaintiffs of any constitutional rights and that they are entitled to judgment as a matter of law.

*Defendant City of Ashburn*

The City of Ashburn cannot be held liable under § 1983 in this action unless "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 692, 98 S.Ct. 2018, 2036–37, 56 L.Ed.2d 611 (1978). "Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 691–92, 98 S.Ct. at 2036.

■ The 'official policy' mandate of *Monell* insures that a municipality is held accountable under § 1983 only for its actions and not the acts of its employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d

452 (1986). Therefore, municipal liability will not be found to exist under a theory of respondeat superior in a § 1983 action. *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir.1985). Nor can official municipal policy be established by proof of the occurrence of a single incident of unconstitutional activity "unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985).

The policy, practice, or custom must be the "moving force of the constitutional violation." *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). "Thus, not only must there be some degree of 'fault' on the part of the municipality in establishing or tolerating the custom or policy, but there also must exist a causal link between the custom or policy and the deprivation." *Fundiller*, 777 F.2d at 1442.

■ The evidence in this case clearly indicates that a genuine issue of material fact exists concerning whether a policy of the City of Ashburn was the moving force of the alleged constitutional deprivations that took place in the instant case. The City of Ashburn had a policy concerning the use of deadly force [5] that authorized its policeman to use deadly force in an unconstitutional manner.[6] There is also uncontroverted evidence that defendant City of Ashburn police officer Ireland relied upon and acted in accordance with Ashburn's policy concerning the use of deadly force

---

**5.** The City of Ashburn had an "official policy" concerning the use of deadly force that was contained in the Ashburn City Police manual which every Ashburn City policeman received and was required to read and memorize. Joint Brief of Defendants Elbert Bean and the City of Ashburn in Support of Motion For Summary Judgment, p. 8.

**6.** Ashburn Police Department Rules and Standards authorized members of the department to use firearms in the discharge of their duty "[i]n effecting the arrest or preventing the escape, when no others means are available, of any felon or person whom the officer has probable cause to believe has committed a felony." The

Eleventh Circuit in evaluating a policy similar to Ashburn's made the following observation applicable to the City of Ashburn's deadly force policy. "The policy makes no provision at all for feasible warnings or for probable cause regarding the risk of physical harm. The policy therefore allows the use of deadly force in some instances where it is forbidden by the Fourth Amendment." *Acoff v. Abston*, 762 F.2d 1543, 1547 (11th Cir.1985). *See also Garner*, 471 U.S. at 11, 105 S.Ct. at 1701 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.").

when he used deadly force to prevent the decedent's escape.[7] These facts demonstrate the existence of a genuine issue of material fact concerning whether an official policy or custom adopted and promulgated by the City of Ashburn caused the deprivation of constitutional rights. Accordingly, defendant City of Ashburn's motion for summary judgment is DENIED.

### Defendant City of Ashburn Police Chief Elbert Bean

 "Like municipalities, supervisors cannot be held liable for the acts of employees solely on the basis of *respondeat superior.*" *Fundiller,* 777 F.2d at 1443. The liability of a supervisor is not dependent, however, on his personal participation. *Wilson v. Attaway,* 757 F.2d 1227, 1241 (11th Cir.1985). "Rather there must be some causal connection between the actions of the supervisory official and the alleged deprivation" *Id.,* or an "affirmative link," as required by *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). "This causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need for improved training or supervision, and the official fails to take corrective action." *Fundiller,* 777 F.2d at 1443.

Plaintiffs allege that defendant Bean deprived them and decedent of their constitutional rights because Bean authorized and maintained a system of grossly inadequate police training and supervision relating to the use of deadly force and because he was grossly negligent in obtaining for himself education and training pertaining to the permissible use of deadly force. Plaintiffs in the instant case, however, have failed to demonstrate the existence of a "causal connection" or an "affirmative link" between the actions or inactions of defendant Bean and the alleged constitutional deprivation. Based on this lack of evidence to support plaintiffs' bare allegations of wrongful con-

duct on the part of defendant Bean, the court finds that plaintiffs have failed to make a showing sufficient to establish the existence of an element essential to their case which they will bear the burden of proof at trial. Accordingly, the court GRANTS defendant Bean's motion for summary judgment as the court finds that there are no issues of material fact concerning Bean's alleged violation of plaintiffs' and decedent's constitutional rights and that Bean is entitled to judgment as a matter of law.

### CONCLUSION

For the foregoing reasons, the court GRANTS the summary judgment motions of defendants Turner County, Sheriff Whiddon, and Chief Bean, as the court finds that there are no issues of material fact concerning plaintiffs' allegations against these defendants and that they are entitled to judgment as a matter of law. The summary judgment motions of defendants City of Ashburn police officer Ireland and the City of Ashburn are DENIED as the court finds the existence of genuine issues of material fact concerning plaintiffs' claims against them that preclude a summary judgment finding. Additionally, the court DENIES defendant Ireland's request for qualified immunity as genuine issues of material facts exist concerning whether or not Ireland is entitled to qualified immunity.

SO ORDERED.

---

**7.** Note Ireland's deposition testimony in response to questions posed by plaintiffs' attorney:
Q. Based on the [City of Ashburn deadly force] policy, is it your understanding that you had the right to shoot him [Wright] or to use deadly force to stop him?
A. Yes.
Q. And that's why you were pulling your revolver?
A. Yes.
Ireland Dep. pp. 32–34.